197 So.2d 172 (1967)
HARRY BOURG CORPORATION, Plaintiff-Appellant,
v.
UNION PRODUCING COMPANY et al. Defendants-Appellees.
No. 6966.
Court of Appeal of Louisiana, First Circuit.
March 13, 1967.
Rehearing Denied April 17, 1967.
Writ Refused June 6, 1967.
Blake G. Arata, of Doyle, Smith & Doyle, New Orleans, H. Minor Pipes, Houma, for appellant.
John T. Guyton, of Hargrove, Guyton, Van Hook & Ramey, Shreveport, Milling, Saal, Saunders, Benson & Woodward, New Orleans, Ellender, Wright & Wurzlow, Houma, for appellees.
Before LANDRY, ELLIS and BAILES, JJ.
BAILES, Judge.
Plaintiff instituted this action to cancel a certain oil, gas and mineral lease of which the defendants, Union Producing Company and Texas Gulf Producing Company, are the lessees. Plaintiff is the owner of the lands covered by this lease. Following trial on the merits, judgment was rendered in favor of defendants. Plaintiff has appealed suspensively and devolutively from this adverse judgment.
In order to more fully understand the situation and circumstances in which the parties hereto were involved at the time the stage was set for this litigation, a brief review of prior events seems desirable.
As the result of certain unspecified differences and disputes between plaintiff's ancestor in title, Harry Bourg, and the two defendants herein, the said Harry Bourg instituted suit against the defendants to *173 cancel the oil, gas and mineral lease owned by defendants. This suit was filed in Terrebonne Parish, however, it was later removed to the federal court. Subsequent to the institution of the litigation by Harry Bourg, in fact, on October 27, 1958, the parties thereto mutually agreed upon a full and complete settlement of their controversy. They entered into a compromise agreement one paragraph of which has given rise to the present suit.
The part of this compromise agreement that is pertinent to this litigation is paragraph numbered 3, which provides:
"3. In lieu of any other obligation which Union or Texas Gulf may owe to Harry Bourg or Harry Bourg Corporation to further develop the premises covered by said Bech Lease, Union and Texas Gulf shall, within six (6) months from the date hereof, commence operations for the drilling of an additional well at a location to be selected by them either upon said Bourg Lands or upon the following described property (hereinafter called `Buckley-Bourg Lands') situated in Terrebonne Parish, Louisiana, to-wit:
 Township 19 South, Range 17 East:
 Section 77, SE¼ of NW¼ N½
 of SW¼; and SW¼ of SW
 ¼;
 Township 20 South, Range 16 East:
 Section 1, All;
 Township 20 South, Range 17 East:
 Section 6, W½ of W½; and NE
 ¼ of NW¼;
and, upon completion or abandonment of said well, shall continue to conduct additional drilling operations on said Bourg Lands or said Buckley-Bourg Lands, or on lands pooled therewith, with not more than six (6) months elapsing between the completion of one well (in case such well were a commercial producer), or not more than one (1) year from the abandonment of one well (in case such well were a dry hole), and the commencement of operations for the drilling or reworking of the same or another well upon said lands, or on lands pooled therewith; provided, however, that Union and Texas Gulf may, in lieu of drilling any one of such wells, execute and record a release of all of their rights, titles, and interest in and to one hundred sixty (160) acres of said lands, which release shall be treated for all purposes of this paragraph as if a commercial producer had been drilled and completed as of the date operations for the drilling of such well were to have been commenced hereunder. All such wells shall be drilled with due diligence, in a workmanlike manner, and in a bona fide effort to discover oil, gas or other mineral, and shall be drilled to a depth at which it could reasonably be expected to encounter oil, gas or other minerals in paying quantities, or to such lesser depth at which heaving shale, fomal formation, excessive salt water flow, or other formation or condition which makes further drilling impracticable according to approved operating practices, should be encountered."
The obligation contracted by the defendants in this compromise agreement, as shown in paragraph 3 supra, was, within six months of October 27, 1958, to commence the drilling of an additional well at a site to be selected by defendants on the described lands. If this well was a commercial producer, another well was to be drilled within six months of the completion date of the first well, and successively within like periods of time wells were to be drilled; however, if any of the wells proved to be dry holes, then instead of within a six month period, the defendants were obligated to commence the drilling of another well within a one-year period. In lieu of drilling such wells within such prescribed periods of time, whichever period proved applicable, the defendants could elect to release from the operation of its oil, gas and mineral lease 160 acres of land. Such release would be considered equivalent to *174 drilling and completing a commercial producer.
The defendants began performance under the terms and conditions of this agreement by drilling a well known as No. 6 Bourg Well, and it was completed as a producer on July 14, 1959. The next drilling commenced on January 13, 1960, and this well was known as No. 1 Bourg Well, and was completed as a producer on April 23, 1960. The defendants continued to meet the time schedule with the last well completed on September 8, 1962. This well was completed as a producer, which meant that, according to the time schedule, the next date for the performance under the agreement must commence by March 8, 1963.
The evidence shows that instead of the defendants drilling another well by March 8, 1963, they moved the necessary equipment on to the location of No. 1 Bourg Well and performed certain work, thereon which, according to their position was a reworking of the well to cause it to produce gas from the 14,550 feet, after the original production from sand at 14,800 feet ceased. Production from this well commenced after the defendants placed a cement plug above the Bourg Sand Zone at the 14,800 level and moved up in the hole and performed the necessary perforations at the 14,500 foot sand
It is the plaintiff's position in this litigation that under the provisions of the compromise agreement above quoted, and the above recited facts that on or prior to March 8, 1963, the defendants had the option to either commence the required "additional drilling operation" or to execute and record the partial release of acreage in the manner provided in order to maintain the lease in effect as to nonproducing acreage.
The defendants' contention is simply this: That they had the option of either drilling another well or of reworking an existing well. This position is based on that portion of the agreement which provides: "* * * and the commencement of operations for the drilling or reworking of the same or another well upon said lands, * * *."
What we have before us for decision is whether the reworking operation conducted by the defendants on the No. 1 Bourg well shall be deemed compliance with the conditions and stipulations of the compromise agreement. From our consideration of the agreement, the question to be decided can be narrowed to a determination of whether the work performed by the defendants was a "reworking" of the well. By the use of the word "or", drilling or reworking, we must conclude that an alternative was acquired by the defendants.
In Article XXIII of the defendants' answer, they alleged:
"That, on or before March 2, 1963, defendants commenced operations for the reworking of the aforesaid Harry Bourg Corporation No. 1 Well located on lands described in said compromise agreement; that such reworking operations were conducted with due diligence and without suspension of such operations and that such reworking operations resulted in the completion of a commercial gas well in the 14,550-Foot Sand on March 14, 1963; with the result that no further activity was necessary for an additional six (6) months, or until September 14, 1963;"
and in explanation of the work that was done on the Harry Bourg Well No. 1 Mr. Donald Mast, a geologist employed by defendant, Union Producing Company, who was accepted as an expert by the trial court, testified as follows:
Transcript Page 58
Q. Now, following the drilling of the Kelly A-1 Well which you said was completed September 8, 1962 what was the next operation conducted on this lease or lands pooled therewith?
A. The reworking of the Harry Bourg No. 1 well.

*175 Q. When was that well reworked?
A. The reworking began March 2, 1963.
Q. And what was the result of that reworking operations?
A. It was completed in the 14,550 foot sand.
Q. On what date?
A. March 14, 1963.
Q. Will you please describe the work done in connection with the reworking of that well?
A. Briefly the reworking procedure consisted of setting a cement plug above the Bourg sand zone in which it had been completed previously, block squeezing the 14,550 foot sand which consists of perforating below the sand and squeezing cement between the previously producing sand perforations, drilling out and perforating and testing at 14,550 foot sand.
Q. In your opinion were the operations conducted on the Harry Bourg Corporation No. 1 well sufficient to constitute the reworking of that well as that term is known and understood in the industry?
A. Yes, sir.
Q. What was the reason for the reworking of the Harry Bourg Corporation No. 1 well?
A. It had ceased to produce from the previous completion.
This witness, in response to interrogation seeking a definition of the word "reworking" as applied to the oil and gas industry, testified:
Transcript Page 54
Q. If the term reworking is applied to an oil and gas well in the industry what is the meaning of that term, generally accepted meaning of that term?
A. My understanding of the term is any process or procedure which you may undertake to either regain, increase or create new production in a well.
Defendants offered the testimony of Mr. Drew Cornell, a consulting petroleum engineer of Lafayette, Louisiana, who had been engaged in his profession for twenty-two years. This witness who was also accepted as an expert by the trial court, testified, as follows:
Transcript Page 77
Q. Mr. Cornell, are you familiar with the term reworking as applied to an oil or gas well?
A. Yes, sir.
Q. Are you familiar with that term as to its general use in the industry?
A. Yes, sir.
Q. What would you say was the meaning of that term in the industry?
A. It is to restore or increase production of a well that has been drilled usually the second attempt.
Q. Have you heard the testimony of the witness Mr. Mast who just preceded you?
A. Yes, sir.
Q. Have you reviewed the operations that he described as reworking operations on various wells in the Bayou Rambio and Bayou Dularge fields prior to hearing his testimony?
A. Yes, sir.
* * * * * *
Q. I ask you specifically if you reviewed the operations conducted with respect to the Harry Bourg Corporation No. 1 well and did you hear Mr. Mast testify as to those operations?
A. Yes, sir.

*176 Q. What would you say as to whether or not those operations on the Harry Bourg Corporation No. 1 well constitute reworking operations as that term is known in the industry?
A. Those were reworking operations.
In rebuttal, plaintiff offered the testimony of Mr. L. C. Aycock, who had previously been accepted by the trial court as an expert in the field of petroleum geology. His testimony included the following:
Transcript Page 98
Q. Would you give us your understanding of the meaning of the work rework in connection with oil and gas wells?
Mr. Guyton:
Your Honor, he's asking as a matter of his own opinion as distinguished from its acceptance in the industry.
THE COURT:
What's acceptable in the industry.
Q. Your understanding of the industry's acceptance of the use of that word rework.
A. The word means to work again on a well. It is used in reference to work on wells that have never produced or work on wells that have produced, used in connection with a well that has never produced. * * In a well that has produced it would be an operation when the well came off of production or ceased production, and it would be an operation to maintain, restore, improve production. * * *.
* * * * * *
Q. Do you recall the detailed testimony yesterday in connection with the specific operations described in paragraphs 18, 19, 21, 23 and 24 of the defendant's answer?
A. Yes, sir.
Q. The experts of the defendants here testified that in their opinion the specific activities described in those articles of the answer would constitute reworking as that word is interpreted in the oil and gas industry. In your opinion would these activities fall within that definition?
A. Yes.
Plaintiff argues that the defendants' own expert witnesses cannot agree upon the meaning of "rework," and that by reason thereof, we should be guided by LSA-C.C. Articles 1950 and 1952 in interpreting the contract.
LSA-C.C. Article 1950 provides:
"When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms."
and LSA-C.C. Article 1952 says:
"Terms, that present two meanings, must be taken in the sense most congruous to the matter of the contract."
We cannot follow plaintiff's argument for the simple reason that we find the very premise of its argument to be fallacious. We find that there is agreement between the defendants' experts, and further that the plaintiff's own expert very clearly agreed with defendants' experts that the operation carried on and completed on the Harry Bourg Corporation Well No. 1 was reworking of the well.
LSA-C.C. Article 1945, provides:
"Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:
* * * * * *
ThirdThat the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences; * * *." *177 LSA-C.C. Article 1946, provides:
"The words of a contract are to be understood, like those of a law, in the common and usual signification, without attending so much to grammatical rules, as to general and popular use."
And LSA-C.C. Article 1947, provides:
"Terms of art or technical phrases are to be interpreted according to their received meaning with those who profess the art of profession to which they belong."
In Lama v. Manale (1951) 218 La. 511, 50 So.2d 15, 23 A.L.R.2d 1312, we find the following pronouncement for the interpretation of a contract:
"[1,2] Where there is a clause in a contract, and that clause is the agreement of the parties, the defense of a lack of knowledge of its existence is untenable. Courts are not created to relieve men of their bad bargains made. Where a clause of a contract is clear and unambiguous, `the letter of it should not be disregarded, under the pretext of pursuing the spirit.'
"[3] As to the defense of variation of the wording with the true intent of the parties, the general rule of law is that the intent must be gathered from the language of the instrument itself, and the contract should be enforced unless such enforcement would lead to absurd consequences, R.C.C. art. 1945, par. 3."
The court stated in Gulf Refining Co. v. Garrett, (1946) 209 La. 674, 25 So.2d 329, on the question of interpretation of contracts that:
"[1,2] It is elementary that in the interpretation of a contract the court must give legal effect to the instrument according to the true intent of all the parties, and such intent is to be determined by the words used therein, without the aid of extrinsic evidence, when these are clear and explicit and lead to no absurd consequence. Revised Civil Code, Article 1945; Hello World Broadcasting Corporation v. International Broadcasting Corporation, 186 La. 589, 173 So. 115; Rudman v. Dupuis, 206 La. 1061, 20 So.2d 363.
Guided by the above jurisprudence and codal provisions, as well as a study of the Compromise Agreement, it is clear to us that we are enjoined to give meaning to the word "reworking" as it is written in the contract, and as defined within the industry.
We believe if we were to construe the term "reworking" as an amplification of the phrase additional drilling operation, requiring that activities performed on an existing well is satisfaction of a periodic obligation of defendants, be of a drilling nature (either sidetracking or deepening), as argued for by the plaintiff, such construction would be totally inconsistent with the plan and unambiguous meaning of the contract itself, and it would be violative of the real intention of the parties. We have no right or office to read into this contract a meaning that obviously is not there. LSA-C.C. Article 1950 has no application herein.
We find from the testimony of the three experts, quoted supra, that the word "rework" has a definite, even though multiple, meaning in the oil and gas industry, and accordingly we are bound to accept this meaning in the sense in which it was used on this compromise agreement, the subject matter of which was an oil, gas and mineral operation.
We find and so hold that the defendants have not violated the terms of the compromise agreement in the manner alleged.
Accordingly, the judgment of the district court is affirmed, at appellant's cost.
Affirmed.