485 So.2d 919 (1986)
Bennett William JARDELL, et al.
v.
HILLIN OIL COMPANY, et al.
No. 85-C-2113.
Supreme Court of Louisiana.
March 31, 1986.
Rehearing Denied May 9, 1986.
*920 Patrick S. Ottinger, Tom Richard, Plauché, Hartley, Lapeyre & Ottinger, Lafayette, William E. Shaddock, Bernard H. McLaughlin, Jr., William B. Monk, Stockwell, Sievert, Viccellio, Clements & Shaddock, Lake Charles, Edward B. Dubuisson, Opelousas, for defendants-applicants.
Karl E. Boellert, Lake Charles, for plaintiffs.
CALOGERO, Justice.
Resolution of the dispute in this case requires interpretation and application of the provisions of a mineral lease in order to ascertain whether the lease has expired under its own terms. Applicable here is the "cessation of production" clause, more specifically the definition of "reworking operations," and the characterization of certain well site activities.
The clause is part of the Louisiana Revised Four form, a printed form which is commonly used by exploration companies. It provides:
6. After the discovery and production of oil, gas or any other mineral in paying quantities, either on the leased premises or on lands pooled therewith, the rights granted shall be maintained in effect during and after the primary term and without the payment of the rentals hereinabove provided for so long as oil, gas or some other mineral is being produced in paying quantities, or Lessee is carrying on operations with reasonable diligence looking to the production thereof. It is provided, however, that if, after the discovery and production of oil, gas or other minerals in paying quantities, the production thereof should cease from any cause this lease shall terminate unless Lessee resumes or restores such production, or commences additional drilling, reworking or mining operations within ninety (90) days thereafter and continues such operations without the lapse of more than ninety (90) days between abandonment of work on one well and commencement of reworking operations or operations for the drilling of another, in an effort to restore production of oil, gas or other minerals, or (if during the primary term) resumes the payment of rentals in the manner hereinabove provided for in connection with the abandonment of wells drilled. Lessee shall not be required to produce more than one mineral, the production of any one mineral in paying quantities and with reasonable diligence being sufficient to maintain all of Lessee's rights. Should Lessee by the drilling of any well located on the land or on property pooled therewith, discover gas or gaseous substances capable of production in paying quantities *921 but which Lessee is unable to produce (or which although previously produced, Lessee is unable to continue to produce) because of lack of market or marketing facilities or Governmental restrictions, then Lessee's rights may be maintained, in the absence of production or drilling operations, by making a payment to Lessors as provided by Paragraph 14 hereof. (Emphasis provided)
Thus, once oil has been discovered on the leased property and is produced in paying quantities, the lease will terminate if production ceases unless the lessee resumes or restores production or "commences additional drilling, reworking or mining operations within ninety (90) days thereafter."
In this case, a mineral lease was executed by the Jardells[1] and Annco Petroleum Company on January 15, 1970, covering 20 acres in the old Vinton Field located in Calcasieu Parish. A single well, designated the Roy Jardell, was drilled on the leased property, and it was completed on June 10, 1970. Although the well was not drilled by Auster Oil and Gas, the latter, a contract operator, assumed the maintenance of the Roy Jardell in 1979. As the contract operator, Auster was paid a flat fee for overhead charges and collected proportionate assessments from the working interest owners for additional expenses.[2]
The well itself is deemed a marginal producer. In fact, 94.3% of produced substances is salt water,[3] and the production of salt water creates special and costly problems. State environmental laws require particular disposal of salt water, prompting in this case need for a holding tank and salt water disposal well in addition to pipe lines leading from the well to these structures. Should the disposal lines become inoperable or allow salt water to spill onto the ground, Louisiana Department of Conservation Commission regulations are violated. Furthermore, the corrosive effects of salt water rapidly wear out any equipment with which the salt water comes in contact.
In this case, problems with salt water disposal were apparently the immediate cause for shutting in the well on June 18, 1981.[4] The three inch PVC (heavy duty plastic) pipe which carried the salt water to the disposal well broke, presumably when trampled by cattle, and spilled water onto the ground. Production was discontinued. The last day of production was on June 17. Repairs to the disposal line were made by Auster on the following day, June 18, as well as on June 26. On the latter date, an attempt was made to resume production, but the pumping unit failed to operate. This malfunction necessitated repairs to the pump jack on July 7 and 8, 1981, which involved removal of the pump jack to a machine shop and an expenditure of some $1800. Although the pump was operational after the repairs, the well would still not produce. Therefore, according to trial testimony, on September 14, or 15, 1981, a pressure pump owned by Tiger Well Service was brought to the well site and employed to test for downhole problems, in the downhole tubing and in the downhole components of the pumping system.[5] On *922 the basis of the test, the field superintendent recommended that the entire tubing string, approximately 3,000 feet of tubular steel, be replaced. Since the anticipated cost would exceed $10,000, the Operating Agreement required written consent of the working interest owners. Accordingly, the contract operator, Auster, circulated AFE's (Authorities for Expenditure) in October of 1981 to the working interest owners to obtain consent to replace at their cost the entire tubing string. After obtaining the necessary approval, the work was actually begun on December 7, 1981, when a workover rig was moved onto the site. On December 8 and 9, the rig pulled the downhole pump rods out of the well, pulled the old tubing out of the well, ran a new string of tubing downhole, replaced the downhole pump rods, and replaced the surface pumping unit. Production resumed on December 10, 1981.[6]
Under the terms of the lease discussed above, the lessees through their contract operator had 90 days from the cessation of production on June 17, 1981 either to resume production or to commence additional drilling, reworking, or mining operations. The period from June 17 to December 10 (when production was resumed) clearly exceeded 90 days. Therefore, if additional drilling, reworking, or mining operations were not commenced by September 15, the 90th day following June 17, or within 90 days of July 8, assuming Auster's action between June 17 and July 8 constitutes reworking, the lease expired under its own terms. Since no additional drilling or mining operations occurred, it remains for us to decide whether reworking operations commenced on or before September 15, 1981.
The trial judge concluded that the lease expired. Although he acknowledged the testimony that testing for downhole problems had occurred within the 90 day period, the trial judge was not convinced that such action was an essential part of a reworking operation for the reason that Auster knew or should have known that the problem was with the tubing, even without testing. The judge specifically noted that this well "had a long history of tubing problems." Thus, the trial judge found that the lessees had not shown a "continuing effort" in their duty to the lessors to resume production as soon as possible.
Two judges of the three-judge panel from the Third Circuit Court of Appeal, 476 So.2d 1118, agreed that in view of the well's history and the almost three month delay prior to testing, "the defendants were not reasonable or diligent in conducting such activity." They found that the activities of the contract operator on and/or prior to September 15, 1981 "did not constitute a `reworking' of the well to restore production."
Prior cases have considered the definition of "reworking" as used in lease provisions in the oil and gas industry. Texas Co. v. Leach, 219 La. 613, 53 So.2d 786 (1951), involved a cessation of production clause, which differed slightly from the one in this case. It provided that
should the production of oil or gas cease from any cause, the said lease shall not *923 be terminated thereby if said The Texas Company, lessee, commences drilling or re-working operations within sixty (60) days thereafter....[7]
In that case, trouble with the tubing had sufficiently reduced production so that the well had to be closed down. The Court noted that within days a drilling company had been contacted to undertake the reworking process. Citing Hudspeth et al. v. Producers' Oil Co. et al., 134 La. 1013, 64 So. 891, 893 (1914),[8] this Court found that operations such as relegging the derrick, pulling tubing, strengthening and reinforcing a bridge, doping tubing and rods and repairing a gas line, all of which occurred within the prescribed 60 day period, constituted reworking.
In Johnson v. Houston Oil Co. of Texas, 229 La. 446, 86 So.2d 97 (1956), a lessee (Houston Oil Company) had subleased a tract of land under the following provision:
It is understood and agreed that in the event oil, gas or any other mineral is not being produced in paying quantities from, and drilling or reworking operations are not being conducted on the property hereinabove described on the 27th of June, 1954, then and in such event the interest herein subleased shall revert to Sublessor.
At issue in the suit was whether the sublessor was actually reworking the well in compliance with the lease by his actions on June 27, 1954. These actions consisted of moving a drilling rig, pump, rotary and kelly joint to the well site, assembling them, and commencing to drill out a cement plug in a well not previously completed as a producer. On the basis of these operations, despite the defendant's contention that they were a sham and that the light rig employed was incapable of performing the task, this Court concluded that the plaintiff was actually engaged in reworking operations on June 27.
A First Circuit opinion, Harry Bourg Corp. v. Union Producing Co., 197 So.2d 172 (La.App. 1st Cir.1967), also considered the definition of reworking operations as found in a contract (in fact it was a compromise agreement). Under the terms of this document, Union and Texas Gulf agreed to commence drilling an additional well on the premises covered by lease within six months and, on completion or abandonment of that well, to conduct additional drilling operations
with not more than six (6) months elapsing between the completion of one well... or not more than one (1) year from the abandonment of one well ... and the commencement of operations for the drilling or reworking of the same or another well upon said lands....
From October 27, 1958 to September 8, 1962, the defendants/producers continued to meet the time schedule of their compromise agreement by drilling wells. Instead of commencing to drill another well by March 8, 1963, however, the defendants moved the necessary equipment to an existing well, intending to produce gas from a different level (14,550 feet as opposed to 14,800 feet). Although the plaintiff/lessor argued to the court that "reworking" was only an amplification of "additional drilling operation," and meant either sidetracking or deepening, the court concluded on the basis of expert testimony that the word "rework" has a "definite, even though multiple, meaning in the oil and gas industry." Reworking was defined by the experts as *924 any process or procedure which you may undertake to either regain, increase or create new production in a well
or activity
to restore or increase production of a well that has been drilled [,] usually the second attempt
or
to work again on a well.... In a well that has produced it would be an operation when the well came off of production or ceased production, and it would be an operation to maintain, restore, improve production.
Thus, the First Circuit concluded that the placement of equipment at the well site in an effort to obtain production of gas from a higher level, accomplished by plugging the hole and making new perforations, was "reworking" and thus not a violation of the compromise agreement.
Finally, in a suit to cancel two oil, gas, and mineral leases, the Third Circuit in House v. Tidewater Oil Co., 219 So.2d 616 (La.App. 3rd Cir.1969) considered whether the defendants had complied with the lease provisions requiring that they commence reworking operations within 90 days after the cessation of production.[9] It was decided that the operations conducted by the independent operator who sought to maintain the lease constituted reworking rather than routine maintenance. The court did not permit a termination of the lease under the cessation of production clause. The well had been abandoned because of excessive amounts of salt water, and the defendant, who acquired the lease and managed to restore production on the 111th day after cessation, took the following steps within the 90 days permitted to commence reworking operations: repaired approximately one mile of board road across a swampy area to the well site; replaced boards, repaired others and reset cattle gaps; built triple matting around the well head to support heavy equipment; moved a wire line service unit onto the well site; and actually removed an accumulation of paraffin and debris from the well hole so that gas began to flow. After the lapse of 90 days, it remained to install new flow lines and a tank battery before gas could be produced in paying quantities.
The House v. Tidewater Oil court quoted extensively from the three earlier cases in concluding that "[e]ach case must depend upon its own facts, in the light of the opinions of the expert witnesses who testify." No doubt an exact definition of reworking operations is difficult to formulate. The problems of producing oil and gas thousands of feet below the surface are many and varied, as are the procedures for rectifying production that is sluggish or has ceased. See Williams and Meyers, Oil and Gas LawManual of Oil and Gas Terms, 758-59 (1984) (citing Lone Star Producing Co. v. Walker, 257 So.2d 496, 500 (Miss.1971).) However, the prior jurisprudence of this state has provided some guidance for distinguishing reworking operations from routine maintenance. For reworking to occur, it is necessary first that production has ceased or slowed down or has never been achieved. Reworking need not involve additional drilling. It is also clear that reworking operations encompass essential preparatory steps. Furthermore production need not be resumed during the delay. There is also the suggestion that the operations conducted by the lessee must be a good faith effort to resume production as soon as possible.[10]
The Manual of Oil and Gas Terms, supra, mentions additional factors cited by courts in other jurisdictions as determinative of a reworking operation. The Alabama Supreme Court in Sheffield v. Exxon Corp., 424 So.2d 1297, 1303 (Ala.1983) declared that an activity should be physically associated with the well site and intimately connected with the resolution of the difficulty *925 that caused the well to cease production in order for it to constitute reworking. However, the presence of a workover rig at the well site was not found to be a necessary incident to a reworking operation in Lone Star Producing Co. v. Walker, 257 So.2d at 500. And, whatever the activity, it must be done "as an ordinarily competent operator would do in the same or similar circumstances," according to a Texas court. Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311, 314 (1953).
Applying these guidelines to Auster's activities during the 90 days after production ceased, we conclude that reworking had commenced and that the lease was maintained. Our determination is based on the definition of "reworking" derived from earlier jurisprudence as well as our analysis of the terms of the cessation of production clause of the mineral lease. It is not dependent on expert testimony, some of which, unfavorably to lessors, incidentally, may have been tainted by personal interest.[11]
Production from the Roy Jardell had ceased. And although production was not restored during the ensuing 90 day delay, timely essential preparatory steps, directly related to resolving the difficulty and constituting part of reworking operations, were taken at the well site. The tubing tests, conducted on September 14 or 15, 1981, constituted commencement of reworking operations, one of the requirements for avoiding termination of the lease under the cessation of production clause. Those reworking operations concluded less than three months later when in December 3000 feet of tubing string was replaced and production thereupon resumed.[12]
It was the contract operator's "good faith effort" on behalf of the working interest owners, or lack thereof, particularly with regard to the timing of the activities designed to restore production, which caused the courts below the greatest concern. It is true of course that minimal preparatory steps, designed simply to avoid termination of the lease and conducted in several successive 80 to 90 day periods, would evidence a lack of "good faith" efforts. That, however, is not what happened here.
In this case, we find actions which we believe are consistent with those of an ordinarily competent operator in similar circumstances. It is significant that the well is a marginal producer and that a sizeable expenditure would not likely be approved by the working interest owners without verification of its necessity. Furthermore, although the trial judge speculated that production stopped because of tubing problems (see footnote 4 supra), it is not clear from the record that the contract operator even suspected a tubing problem when the well was shut in, on June 18, 1981. The immediate problem was the repair of salt water disposal lines, followed by the failure of the pumping unit. The pump repair was not accomplished until early July, and it was not until that time, when the well still would not produce, that the contract operator was required to focus on other possible problems, such as the tubing. In all events, production was actually restored within five months of the repair to the pump and within less than three months after the September 15 pressure testing of the tubing. It appears that the contract operator in this case followed a logical sequence of actions in determining the problem and ultimately generating enhanced *926 production in this marginally producing well.
In conclusion we find that under the cessation of production clause the lease did not terminate, for lessees through Auster commenced "good faith" reworking operations within 90 days of the shut in of the well.

Decree
For the foregoing reasons the judgments of the district court and Court of Appeal are reversed; judgment is rendered in favor of defendants and against plaintiffs dismissing their petition with prejudice and at plaintiffs cost.
REVERSED AND RENDERED.
LEMMON, J., concurs.
NOTES
[1] The original lessors included Roy Jardell, Howard Jardell, Daniel Jardell, Marie Jardell, Bernett Jardell, Major Albert Hamblet, Jr., Janell Hamblet Hebert, Pearl Jardell Davis, Mabel Jardell, Edward Jardell, Debra Jardell, and Paul Jardell.
[2] The working interest owners received monthly reports which contained the additional charges in joint interest billings.
[3] Approximately fifteen barrels of oil are produced each day as compared to 250 barrels of salt water.
[4] The trial judge stated that he did not know that "there was ever any evidence actually presented as to the exact cause of its ceasing" and assumed that production stopped because of tubing problems. However, the fact that the shutting in of the well actually coincided with repair to the salt water lines indicates that the break was at least an immediate cause of the cessation of production.
[5] Auster's field superintendent, Ray McClelland, testified that he had ordered the pressure test and was present when the Tiger Well Service pump was used on the Roy Jardell well in September of 1981. (McClelland was not certain whether the test occurred on the 14th or 15th.) He and John Hogan, president of Auster, testified that this equipment had been in use on adjacent property also operated by Auster and was simply transferred to this particular well site for the day. In this manner, they explained the absence of a specific billing or invoice from Tiger identifying this service with the Roy Jardell. It was suggested that billing for this work may have been reflected in Tiger's billings on another Auster operation. In response to questioning, Hogan admitted at trial that a service company other than Tiger could have done the testing. However, he justified the wait because of Auster's long working relationship with Tiger and Tiger's competent personnel, who were quite familiar with these wells and their problems. In all events there is no written evidence to support the testimony that the pressure test was accomplished on the asserted date other than Hogan's hand written notation on the well history document.
[6] There were additional activities from June 18 to December 10, but those were less clearly directed toward the resumption of production. On August 12, 1981, for instance, a bulldozer was utilized to clear the well location, and, on December 1 and 2, a gate and cattle guard were repaired.
[7] In the cessation of production clause under consideration in this case, the lessee may avoid termination of the lease by resuming production as well as by commencing drilling or reworking operations, and has 90 as opposed to 60 days within which to do so.
[8] Under the terms of the lease in Hudspeth, if the lessee did not commence drilling operations within 24 months, the lessor could terminate the lease by giving written notice. Prior to notice, however, the lessee had selected the drilling site, cleared it, and sawed blocks for a derrick. The Court concluded that the commencement of this work satisfied the condition of the lease and that the lessor thereafter had no legal right to declare the contract a nullity.
[9] The cessation of production clause was identical to that under consideration in this case.
[10] In concluding that the producer/defendant had timely commenced reworking operations, the Court in Texas Co. v. Leach found it pertinent that "(t)he Texas Company did not delay in contacting a drilling company."
[11] It was elicited in trial testimony that the lessors' expert, Thomas Blankenship, Jr., had owned an interest, prior to trial, in Reedland Energy, Inc., the company which had obtained a lease on the disputed property in the belief that the lease held by defendants here had terminated. Although he had disposed of that interest before trial, he continued participation in other oil and gas ventures with Myron Palermo, a present owner of Reedland.
[12] Plaintiffs' expert specifically testified that replacement of tubing was a workover operation. It appears that only in dissent in the jurisprudence has the notion been embraced that reworking operations are limited to "operations affecting the ability of the producing formation or horizon to feed into the well bore." House v. Tidewater Oil Co., 219 So.2d at 624-25 (Fruge, dissenting) and at 628 (Tate, dissenting from rehearing denial).