(837 P.2d 823)

No. 63,536 ∎

PRO-CHEM, INC., *et al.,* *Plaintiffs,* v. LASSETTER PETROLEUM, INC., *et al., Appellees,* and L.E. WATSON and HELEN WATSON, *Appellants.*

Opinion filed January 26, 1990.

*Royce E. Wallace,* of Wallace & Zimmerman, of Wichita, and *Don E. Watson,* of Englewood, Colorado, for the appellants.

*Theodore C. Geisert,* of Geisert & Watkins, P.A., of Kingman, for the appellees.

Before ABBOTT, C.J., BRISCOE, J., and MELVIN M. GRADERT, District Judge, assigned.

GRADERT, J.: L.E. and Helen E. Watson, lessors of an oil and gas lease, appeal from the trial court's grant of summary judgment to the working interest owners determining that the lease did not expire by its own terms.

On June 7, 1983, the Watsons executed in favor of Lassetter Petroleum Corporation an oil and gas lease covering real property located in Rice County. Drilling commenced and the well was completed as a producer in January 1984. Production continued until August 29, 1984. At that time, Lassetter stopped production because it could no longer use the saltwater disposal well it had been leasing. There is conflicting evidence as to the reason for no longer using the well. A new saltwater disposal site was found and construction to reroute the pipeline was completed in early November 1984. Production of oil from the Watson-Lisa No. 1

began on November 13, 1984, after a cessation of 76 days. There was a cessation of production clause in the lease that stated the lease expired after the production ceased in the secondary term unless drilling or reworking operations were begun within 60 days. It is undisputed that work on rerouting the saltwater disposal pipeline began within the 60-day time frame.

This litigation began as a foreclosure on alleged mechanics' liens held by oil field suppliers. During the course of the litigation, a receiver was appointed to operate the well after Lassetter went into bankruptcy. At the culmination of the litigation at the November 18, 1988, hearing, the court noted the disposition of most of the prior claims. In granting summary judgment for the working interest holders against the lien claimants, the court found that none of the liens still pending against the Watson lease were valid. In addition, the court granted summary judgment for the working interest holders against the Watsons, finding the oil and gas lease executed on June 7, 1983, did not expire for cessation of production and was still in effect as far as the working interest owners were concerned. A timely notice of appeal was filed.

"Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Mick v. Mani,* 244 Kan. 81, 83, 766 P.2d 147 (1988). On appeal, the record is read in the light most favorable to the party defending against the motion for summary judgment. 244 Kan. at 83. In addition, "[t]his court's review of conclusions of law is unlimited." *Hutchinson Nat'l Bank & Tr. Co. v. Brown,* 12 Kan. App. 2d 673, 674, 753 P.2d 1299, *rev. denied* 243 Kan. 778 (1988).

The Watsons contend that rerouting the saltwater disposal pipeline cannot be defined as reworking operations and, therefore, the lease expired in accordance with its terms.

The habendum clause in the lease, paragraph 2, states the following:

"It is agreed that this lease shall remain in full force and effect for a primary term of ONE (1) year from this date, and as long thereafter as oil, gas or the products of oil or gas are produced from said leased premises, or drilling operations are continued as hereinafter provided."

The cessation of production clause, paragraph 8 of the lease, sets forth the following requirements:

"If at the expiration of the primary term of this lease, oil, gas, or the products of oil and gas are not being produced on the leased premises but Lessee has been engaged in drilling or reworking operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises, and operations shall be considered to be continuously prosecuted if not more than sixty (60) days shall elapse between the completion of the abandonment of one well and the beginning of operations for the drilling of a subsequent well. If, after the discovery of oil or gas or the products of oil or gas on said land or on acreage pooled therewith, the production thereof 1 should cease from any cause after the primary term, this lease shall not terminate if Lessee commences additional drilling or re-working operations within sixty (60) days from the date of cessation of production or from date of completion of a dry hole. If oil, gas or the products of oil or gas shall be discovered and produced as a result of such operations at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil, gas, or the products of oil or gas shall be produced from the leased premises."

Reworking, when considered in the context of oil and gas leases, is a term of art, and whether any particular operation falls under the definition depends upon the facts peculiar to that operation. Some of the most often quoted definitions include:

"The crucial test which must be met for an activity to constitute reworking is whether the operation is associated or connected with the physical site of the well or unit. Additionally, the operation must be intimately connected with the resolution of whatever physical difficulty caused the well to cease production." *Sheffield v. Exxon Corp.*, 424 So. 2d 1297, 1303 (Ala. 1982).
" '[R]e-working operations' . . . means actual work or operations which have theretofore been done, being done over, and being done in good faith endeavor to cause a well to produce oil and gas or oil or gas in paying quantities as an ordinarily competent operator would do in the same or similar circumstances." *Rogers v. Osborn*, 152 Tex. 540, 544, 261 S.W. 2d 311 (1953).
" '[R]eworking shall be defined as including, but not limited to, operations for and the reconditioning, deepening, plugging back, cleaning out, or repairing of any well or wells, or otherwise attempting in good faith to increase or restore production or discover new production.' " 3 Williams, Oil and Gas Law § 618.1 (1988).

The court in *Jardell v. Hillin Oil Co.*, 485 So. 2d 919 (La. 1986), determined that essential preparatory steps taken to restore production, which included testing tubing, constituted reworking.

485 So. 2d at 925. The contract operator's good faith in attempting to restore production was also a factor. 485 So. 2d at 925. In *House v. Tidewater Oil Company*, 219 So. 2d 616 (La. App.), *writ refused* 253 La. 1081 (1969), repairing a mile of board road, building a new triple matting around the well to support heavy equipment, and removing paraffin and debris from the well constituted reworking. 219 So. 2d at 623. Again, reasonableness, diligence, and good faith on the part of the operator were factors in the court's decision. 219 So. 2d at 623. Likewise, in *Sheffield v. Exxon Corp.*, 424 So. 2d 1297, various preliminary activities designed to obtain compression facilities constituted reworking. 424 So. 2d at 1301-02. In some of the above cases, reworking consisted of operations done on the leased premises, while in others, such as *Tidewater Oil*, reworking included actions away from the lease site.

Under the present facts, the well was shut down because the saltwater disposal well being used by the operator was no longer available. It is unclear why the well was no longer available. Either the rental was not paid, there was bacteria in the well, or the owner of the well was just being contrary. Although the timeline for finding a new disposal well and at what time the actual work began is unclear, it appears construction began after negotiations for the new well were completed. Constructing the pipeline entailed getting right-of-way easements from three separate landowners and crossing a river. During the course of the construction, it was enjoined once by one of the landowners and, when construction resumed, a new contractor had to be employed. It is not disputed that the construction began within 60 days of cessation of the oil production. The clause in question only requires that reworking operations be started within 60 days, not completed within that time. The construction on the pipeline was primarily away from the leased premises.

We are of the opinion rerouting the saltwater disposal line constitutes reworking. The construction was actual work done in a good faith attempt to restore oil production in paying quantities. The saltwater disposal line connected with the well, and the well could not be operated without disposing of the saltwater.

Although the Watsons argue that Lassetter could have used a truck to carry the saltwater away from the oil well, the trial court

found Lassetter began to seek a permanent solution within a reasonable period of time. The Watsons also argue that Lassetter had to shut down the well due to his own imprudence in not paying Dale Brown the money due for leasing the saltwater disposal well. The lease states that production may cease "from any cause."

The bottom line is that there had to be some way to dispose of the saltwater being pumped from the oil well. There is nothing in the record to establish that a prudent operator would have continued to operate the well and carry the saltwater away by truck. There also is no evidence in the record that Lassetter was not diligently trying to complete the pipeline to get the well back in operation. On this basis, the trial court did not err in determining that construction of the pipeline constitutes reworking, and that the time to complete the work was reasonable.

Affirmed.