694 So.2d 296 (1996)
ALLAIN-LEBRETON COMPANY
v.
EXXON CORPORATION, et al.
No. 95 CA 1576.
Court of Appeal of Louisiana, First Circuit.
April 4, 1996.
*298 Robert L. Cabes, Lafayette, for Plaintiff/Appellant Allain-LeBreton Company.
Louise V. White, William Courtney, New Orleans, for Defendant/Appellee Exxon Corporation.
Christopher J. Boudreaux, Thibodaux, for Defendants/Appellees Margaret Robichaux Baudoin, Myra Robichaux Blanchard, Mary Robichaux Boudreaux, David J. Robichaux, Jr., and Mary Weimer Robichaux.
Loulan J. Pitre, Jr., Cut Off, for Defendant/Appellee Taylor Energy Company.
David A. Kerstein, New Orleans, for Defendants/Appellees Monte C. Shalett, Individually and as Trustee for the Monte Cresap Shalett Trust.
David W. Rusch, Mandeville, for Defendants/Appellees Flash Gas and Oil Northeast, Inc., and Ashlawn Corporation.
Barry H. Grodsky, New Orleans, for Defendant/Appellee Jacqueline McPherson as Executrix of Joy B. Shalett.
W.C. Hollier, Lafayette, for Defendants/Appellees Russell M. Frankel, Individually and as Trustee of the Sherry Gwynne Frankel Louisiana Testamentary Trust, and Sherry Frankel Greenwald, et al.
C.G. Norwood, Jr., New Orleans, for Defendants/ Appellees Dorothy Pecot Norwood, Richard C. Pecot, and Marguerite Pecot Singleton.
William S. Strain, Baton Rouge, for Defendants/Appellees Estate of Wylmer I. Pool Through Wylmer Crenshaw Pool as Executor, and First National Bank of Commerce as Trustee of the Wylmer Crenshaw Pool Trust #3.
Herbert W. Christenberry, Metairie, for Defendant/Appellee Ashlawn Corporation.
Before CARTER and PITCHER, JJ., and CRAIN, J. Pro Tem.[1]
CARTER, Judge.
This is an appeal from a trial court judgment on a motion for summary judgment.

BACKGROUND
On January 15, 1948, the Lafourche Land Company, Incorporated granted an oil, gas, and mineral lease (the "Lease"), covering approximately 3,323 acres of property in the Clovelly Field, Lafourche Parish, Louisiana, to Wylmer I. Pool. By act, dated May 6, 1963, Shell Oil Company, Humble Oil & Refining Company, and J.R. Frankel, then owners of the "Lease," released 2,305 acres of the property from the "Lease;" however, the "Lease" was specifically retained on the 1,018 acres in Township 18 South, Range 22 East and in Township 19 South, Range 22 East.
Paragraph 5 of the "Lease" provided, in pertinent part, as follows:
If at the expiration of the primary term or at the expiration of the sixty (60) day period provided for in the preceding sentence, oil, gas, sulphur or other mineral is not being produced on said land but Lessee is then engaged in drilling operations or reworking operations thereon, or if production previously secured should cease from any cause after the expiration of the primary term, this lease shall remain in force so long thereafter as Lessee either (a) is engaged in drilling operations or reworking operations with no cessation between operations or between such cessation of production and additional operations of more than sixty (60) consecutive days; or (b) is producing oil, gas, sulphur or other mineral from said land hereunder.
Paragraph 3 of the "Lease" also provided that, if a well is shut-in, the lessee may make shut-in payments, beginning ninety (90) days after the shut-in, and maintain the "Lease" without production or operations for a period of five (5) years.
On December 31, 1977, plaintiff, Allain-LeBreton Company (Allain-LeBreton), acquired rights in the "Lease." The "Lease" was maintained by drilling and production activities, until October 14, 1991, when all production stopped.

*299 FACTS

On July 1, 1993, Allain-LeBreton filed the instant suit for declaratory judgment, seeking a determination that the oil, gas, and mineral lease had terminated and requesting other relief against the former working interest owners at the expiration and termination of the lease,[2] transferees of the former working interest owners,[3] former overriding royalty owners,[4] and other parties who may have an interest in the "Lease."[5] In its petition, Allain-LeBreton sought a determination that the "Lease" had expired and terminated under its own provisions. Allain-LeBreton alleged that, under the terms of the lease, the lease would terminate at the expiration of sixty (60) days after the cessation of production of oil and gas in paying quantities without resumption of production or drilling or reworking operations within such period of time. Allain-LeBreton alleged that in October, 1991, production of oil and gas in paying quantities ceased and that, during the sixty (60) days thereafter, production was not resumed, nor were drilling or reworking operations conducted on the leased premises.
In its petition, Allain-LeBreton also sought an accounting and money judgment from certain defendants for the proceeds from the sale of oil and gas derived from the "Lease." Allain-LeBreton alleged that, after the expiration of the lease, certain defendants produced oil and gas from the "Lease" without any legal right to do so. Accordingly, Allain-LeBreton alleged that it was entitled to the net proceeds so derived.
The defendants answered Allain-LeBreton's petition, generally denying the allegations and asserting that the "Lease" had been maintained in full force and effect.
Thereafter, on February 14, 1995, the defendants filed a motion for summary judgment, contending that there were no genuine issues of material fact in dispute and that they were entitled to judgment as a matter of law. In support of their motion, defendants argued that they had engaged in timely good faith reworking operations during the period in question such that the lease was maintained. Attached to defendants' motion for summary judgment were copious documents, including the oil and gas lease, dated January 15, 1948; a history of Clovelly Field; various affidavits with attachments, and excerpts of numerous depositions with a plethora of attachments.
The affidavits filed by defendants included affidavits by: Barry C. Ellis,[6] an Exxon petroleum technologist who prepared AFEs (authority for expenditure forms) for the Clovelly Field, as well as a history of the Clovelly Field, outlining the operations performed by Exxon and Flash in the Clovelly Field;[7] Kirby Chaisson, a welder who performed work in the Clovelly Field in December, 1991, and January, 1992;[8] Steve J. Dufrene, superintendent at Harris Dufrene Enterprise, which furnished equipment to Exxon or its contractors in the Clovelly *300 Field in January, 1992;[9] Eric P. Bollinger, president of Bollinger Workover, Inc., which furnished labor and equipment operators to Exxon in the Clovelly Field between November 14 and December 5, 1991;[10] Steven G. Haller, president of Flash, regarding production in the Clovelly Field during Flash's ownership,[11] and Joseph Wilson, maintenance foreman with Exxon, who verified the invoices by Chaisson, Dufrene, and Bollinger for work performed in November and December, 1991.
The depositions filed by defendants included those of: Mark Agnew, a reservoir engineer who performed tests in the Clovelly Field in November, 1991;[12] Thomas Stringer, who testified regarding pipe supplied to the Clovelly Field;[13] and Barry Ellis, Exxon petroleum technologist.[14]
Allain-LeBreton opposed the motion for summary judgment, contending that the issues presented in the motion for summary judgment involved a factual determination of whether the activities conducted by Exxon constituted reworking operations within the meaning of the lease. Attached to Allain-LeBreton's opposition were the depositions of Joseph B. Elam, Exxon's section supervisor for the East/West Property Analyses Section;[15] Mark R. Agnew, Exxon reservoir technologist;[16] and Thomas R. Stringer, senior field superintendent with Exxon.[17]
On April 4, 1995, a hearing on the motion for summary judgment was held. Thereafter, the record was held open to permit Allain-LeBreton an opportunity to submit the depositions of Jerry Raggio, an engineer and gas lift consultant,[18] and William Hise, consulting petroleum engineer,[19] which were filed on April 24, 1995.
On April 21, 1995, the trial court issued written reasons for judgment. The trial court determined that the deposition testimony of Raggio and Hise was merely opinion testimony in that neither expert had personal knowledge of Clovelly Field and that such deposition testimony could not be considered. The court determined that there were no genuine issues of material fact in dispute and that the issue of whether the work performed by defendants constituted reworking operations was an issue of law, citing Jardell v. Hillin Oil Company, 485 So.2d 919 (La. 1986). The court pointed out that Jardell is clear that each case must depend on its own facts. The court concluded that, based on the activities conducted by the defendants in this case, "the operator acted prudently under the circumstances to restore the wells to *301 production, and that the work of the operator was `reworking' of the wells according to the standards set out in Jardell." Accordingly, the trial court rendered judgment, granting defendants' motion for summary judgment and dismissing Allain-LeBreton's claims at its costs.
From this adverse judgment, Allain-LeBreton appeals, assigning the following specifications of error:
1. The district court erred in holding that there is no genuine issue as to any material fact in this case, and that defendants were entitled to summary judgment as a matter of law.
2. The district court erred in finding that summary judgment was appropriate for resolving issues of good faith, credibility of witnesses and complex petroleum technology.
3. The district court erred in rejecting the testimony of Bill Hise and Jerry Raggio on the ground that their testimony was a matter of opinion not based on personal knowledge.

SUMMARY JUDGMENT
A motion for summary judgment is a procedural device used to avoid a full-scale trial when there is no genuine factual dispute. Kidd v. Logan M. Killen, Inc., 93-1322 p. 4 (La.App. 1st Cir. 5/20/94), 640 So.2d 616, 618; Jarrell v. Carter, 632 So.2d 321, 323 (La.App. 1st Cir.1993), writ denied, 94-0700 (La. 4/29/94), 637 So.2d 467; Ouachita National Bank in Monroe v. Gulf States Land & Development, Inc., 579 So.2d 1115, 1120 (La.App. 2nd Cir.), writ denied, 587 So.2d 695 (La.1991). The motion should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966; Potter v. First Federal Savings and Loan Association of Scotlandville, 615 So.2d 318, 325 (La.1993); Kidd v. Logan M. Killen, Inc., 640 So.2d at 618-19.
A fact is material if its existence is essential to the plaintiff's cause of action under the applicable theory of recovery and without which the plaintiff could not prevail. Material facts are those that potentially insure or preclude recovery, affect the litigant's ultimate success, or determine the outcome of a legal dispute. Penalber v. Blount, 550 So.2d 577, 583 (La.1989); Kidd v. Logan M. Killen, Inc., 640 So.2d at 619; Miramon v. Woods, 25-850 p. 10 (La.App. 2nd Cir. 6/22/94), 639 So.2d 353, 359; Jarrell v. Carter, 632 So.2d at 323.
The burden is upon the mover for summary judgment to show that no genuine issue of material fact exists, and only when reasonable minds must inevitably conclude that mover is entitled to judgment as a matter of law is summary judgment warranted. Kidd v. Logan M. Killen, Inc., 640 So.2d at 619; Robertson v. Our Lady of Lake Regional Medical Center, 574 So.2d 381, 384 (La. App. 1st Cir.1990), writ denied, 573 So.2d 1136 (La.1991). To satisfy this burden, the mover must meet a strict standard by showing that it is quite clear what the truth is and excludes any real doubt as to the existence of material fact. Kidd v. Logan M. Killen, Inc., 640 So.2d at 619; Ouachita National Bank in Monroe v. Gulf States Land & Development, Inc., 579 So.2d at 1120. The court must closely scrutinize the papers supporting the position of the mover, while the papers of the party opposing the motion are to be treated indulgently. Miramon v. Woods, 639 So.2d at 359; Ortego v. Ortego, 425 So.2d 1292, 1297 (La.App. 3rd Cir.1982), writ denied, 429 So.2d 147 (La.1983).
Summary judgments are not favored and should be used cautiously and sparingly. Penalber v. Blount, 550 So.2d at 583; Kidd v. Logan M. Killen, Inc., 640 So.2d at 619. In determining whether material facts have in fact been disposed of, any doubt is to be resolved against granting the summary judgment and in favor of trial on the merits. Sanders v. Hercules Sheet Metal, Inc., 385 So.2d 772, 775 (La.1980). This is true even if grave doubt exists as to a party's ability to establish disputed facts at trial. Equipment, Inc. v. Anderson Petroleum, Inc., 471 So.2d 1068, 1070-71 (La.App. 3rd Cir.1985). Where the trial court is presented with a choice of reasonable inferences *302 to be drawn from the subsidiary facts contained in the affidavits, attached exhibits, and depositions, the reasonable inferences must be viewed in the light most favorable to the party opposing the motion. Jones v. Briley, 593 So.2d 391, 393 (La.App. 1st Cir.1991).
Appellate courts are to review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Potter v. First Federal Savings and Loan Association of Scotlandville, 615 So.2d at 325; Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La.1991). Because it is the applicable substantive law that determines materiality, whether or not a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Sun Belt Constructors, Division MCC Constructors, Inc. v. T & R Dragline Service, Inc., 527 So.2d 350, 352 (La.App. 5th Cir. 1988).

REWORKING OPERATIONS
In the instant case, it is undisputed that production in the Clovelly Field ceased on or about October 14, 1991. Therefore, the central issue before this court is whether any operations performed by defendants in November and December, 1991, and January, 1992, were sufficient to constitute "reworking" within the contemplation of the "Lease" such that operations did not cease for more than sixty (60) consecutive days.
Prior jurisprudence has considered the definition of "reworking" as used in lease provisions in the oil and gas industry. See Jardell v. Hillin Oil Company, 485 So.2d 919; House v. Tidewater Oil Company, 219 So.2d 616 (La.App. 3rd Cir.), writ denied, 253 La. 1081, 221 So.2d 516 (1969); Harry Bourg Corporation v. Union Producing Company, 197 So.2d 172 (La.App. 1st Cir.), writ denied, 250 La. 903, 199 So.2d 917 (1967); Texas Co. v. Leach, 219 La. 613, 53 So.2d 786 (1951).
Texas Co. v. Leach, 53 So.2d at 786, involved a cessation of production clause, which provided that "should the production of oil or gas cease from any cause, the said lease shall not be terminated thereby if said The Texas Company, lessee, commences drilling or re-working operations within sixty (60) days thereafter." Texas Co., 53 So.2d at 789. In that case, trouble with the tubing had sufficiently reduced production so that the well had to be closed down. The court noted that, within days, a drilling company had been contacted to undertake the reworking process. The court determined that operations such as re-legging the derrick, pulling tubing, strengthening and reinforcing a bridge, doping tubing and rods, and repairing a gas line, all of which occurred within the sixty-day period, constituted reworking.
In Harry Bourg Corporation v. Union Producing Company, 197 So.2d at 172, the court considered the definition of reworking operations. Under the terms of a compromise agreement, the defendants agreed to commence drilling an additional well on the premises covered by the lease within six (6) months and, on completion, or abandonment of that well, to conduct additional drilling operations "with not more than six (6) months elapsing between the completion of one well ... or not more than one (1) year from the abandonment of one well ... and the commencement of operations for the drilling or reworking of the same or another well upon said lands." Harry Bourg Corporation, 197 So.2d at 173. Between October 27, 1958, and September 8, 1962, the defendants met the time schedule of the agreement by drilling wells. However, instead of drilling another well by March 8, 1963, the defendants moved equipment to an existing well in an attempt to produce gas from a different level. The court concluded that, on the basis of expert testimony, the word "rework" has a "definite, even though multiple, meaning in the oil and gas industry." Harry Bourg Corporation, 197 So.2d at 177. The experts defined "rework" as "any process or procedure which you may undertake to either regain, increase or create new production in a well," Harry Bourg Corporation, 197 So.2d at 175, or activity "to restore or increase production of a well that has been drilled usually the second attempt," or "to work again on a well.... In a well that has produced it would be an operation when the well came off of production or ceased production, and it would be an operation to *303 maintain, restore, improve production." Harry Bourg Corporation, 197 So.2d at 176. On appeal, the court concluded that the placement of equipment at a well site and the efforts to obtain production of gas from a higher level, accomplished by cementing the hole and making new perforations, constituted reworking.
House v. Tidewater Oil Company, 219 So.2d at 616, concerned whether the defendants complied with the lease provisions, requiring that they commence reworking operations within ninety (90) days after the cessation of production. The court noted that "[e]ach case much depend upon its own facts, in the [sic] light of the opinions of the expert witnesses who testify." House, 219 So.2d at 623. After considering the testimony of various expert witnesses, the court determined that the operations conducted by the independent contractor, which included repairing a mile of board road to a well site, replacing and repairing board and resetting cattle gaps, building triple matting around the well to support heavy equipment, moving a wireline service unit to the well site, and removing an accumulation of paraffin and debris from the well hole, were reworking operations, and not maintenance operations.
More recently, in Jardell v. Hillin Oil Company, 485 So.2d at 919, the court interpreted and applied the provisions of a mineral lease, and specifically the cessation of production clause and the definition of "reworking operations," to determine whether, because of the characterization of certain well-site activities, the lease had expired under its own terms. The lease provided that, once oil is discovered on the leased property and produced in paying quantities, the lease would terminate if production ceased unless the lessee resumed or restored production or commenced additional drilling, reworking, or mining operations within ninety (90) days thereafter. As a result of problems with salt water disposal, production ceased on June 17, 1981, and the well was shut-in the following day. Under the terms of the lease, the lessees had ninety (90) days from the cessation of production to either resume production or to commence additional drilling, reworking, or mining operations. Production did not resume until December 10, 1981, which exceeded ninety (90) days. Therefore, the issue before the court was whether reworking operations commenced on or before September 15, 1981, the ninetieth day after the cessation of production. In determining that reworking had commenced during the ninety (90) days following the cessation of production, the court based that determination on the definition of "reworking" derived from earlier jurisprudence, as well as the analysis of the terms of the cessation of production clause in the mineral lease. The court noted that the determination was not dependent on expert testimony. The court also determined that the actions taken in the rework were consistent with those of an ordinarily competent operator.
While each of the aforementioned cases determined whether certain activities constituted reworking for the purposes of a cessation of production clause in an oil and gas lease, each of these cases was decided after a trial on the merits after due consideration of all evidence. This jurisprudence illustrates the types of activities which might constitute reworking. However, these cases do not stand for the proposition that certain activities constitute reworking as a matter of law. Nor do the aforementioned cases stand for the proposition that a determination of whether certain activities constitute reworking is one which is appropriate for summary judgment. In fact, House v. Tidewater Oil Company, 219 So.2d at 623, clearly points out that "[e]ach case must depend upon its own facts, in the [sic] light of the opinions of the expert witnesses who testify."
The affidavits presented in the instant case, and the affidavits by Chaisson, Kirby, Dufrene, Bollinger, and Wilson specifically, establish that these persons or entities provided labor or equipment to the Clovelly Field during the relevant time period. However, they do not, and cannot, speak to the purpose for which that labor or equipment was used. The affidavit of Haller addressed production and activities in the Clovelly Field which were outside the relevant time period.
*304 The deposition testimony of Ellis, Agnew, Stringer, and Elam addressed the activities conducted in the Clovelly Field between October, 1991, through the restoration of production in the field and involved a collection of notes, operation and service reports, and analyses of reservoir conditions. All four of these present or former Exxon employees performed work in the Clovelly Field during the relevant time period. Each also expressed his views as to why various activities were conducted in the Clovelly Field. The trial court, however, refused to consider the deposition testimony of Raggio and Hise because it was opinion testimony and was not based on personal knowledge.
We acknowledge that LSA-C.C.P. art. 967 requires that affidavits be based upon personal knowledge and that, as a general rule, statements in affidavits or depositions of the opinion or belief of an expert based on his special training and experience do not meet the requirement of personal knowledge. Jones v. Allstate Insurance Company, 619 So.2d 111, 114 (La.App. 1st Cir.), writ denied, 626 So.2d 1186 (La.1993); Weston v. Raymond Corporation, 531 So.2d 528, 531 (La.App. 5th Cir.), writ denied, 533 So.2d 360 (La.1988); McCoy v. Physicians & Surgeons Hospital, Inc., 452 So.2d 308, 310 (La.App. 2nd Cir.), writ denied, 457 So.2d 1194 (La.1984). However, in Obiago v. Merrell-National Laboratory, Inc., 560 So.2d 625 (La.App. 4th Cir.), writ denied, 565 So.2d 445 (La.1990), the court noted that an expert opinion, derived from scientific/medical data, as to whether under any circumstances a product may cause birth defects, is more a statement of fact based on personal knowledge acquired through research and experience than an expert opinion based on hypothetical or assumed facts.
Although the deposition testimony of Ellis, Agnew, Stringer, and Elam was based upon personal knowledge of activities which occurred in the Clovelly Field, each witness expressed his opinion as to the purpose of those activities. Similarly, the deposition testimony of Raggio and Hise expressed their views as to the purpose of the activities conducted by or on behalf of Exxon and was based on the same activities on which Ellis, Agnew, Stringer, and Elam based their views. The opinions expressed by Raggio and Hise, as well as by the Exxon employees, were more in the nature of fact based on personal knowledge acquired through research and experience than an expert opinion based on hypothetical or assumed facts. Further, the views of these individuals addressed whether, under the circumstances presented, the activities conducted in the Clovelly Field during the relevant time period could constitute "reworking" within the context of a cessation of production clause.
As a general rule, expert opinion statements and testimony require evaluation by the trier of fact as to probative value. McCoy v. Physicians & Surgeons Hospital, 452 So.2d at 310. Moreover, credibility of witnesses and doubt as to whether a party alleging a fact will be able to sustain his burden of proof on the merits are improper considerations in determining the existence of material facts. Miramon v. Woods, 639 So.2d at 359.
In the instant case, we find that defendants, as the movers in the motion for summary judgment, have the burden of establishing that the lease had not expired within the meaning of the cessation of production clause. After reviewing the entire record in this matter, we cannot say that defendants have carried their burden of establishing that a sixty (60) consecutive-day period had not elapsed without the performance of reworking activities. Whether the activities conducted in the Clovelly Field during the relevant period were designed to restore production and constitute "reworking" or whether these activities were mere maintenance activities incapable of restoring production cannot be made based upon this record without consideration of the views expressed by the expert witnesses, which requires evaluation by the trier of fact as to probative value as well as credibility determinations. As a result, summary judgment is inappropriate to make such determinations.

CONCLUSION
For the foregoing reasons, the judgment of the trial court, granting defendants' motion *305 for summary judgment and dismissing Allain-LeBreton's claims, is reversed, and the matter is remanded to the trial court for further proceedings consistent with the views expressed herein. Defendants, Exxon and Flash, are assessed with all costs of this appeal.
REVERSED AND REMANDED.
NOTES
[1] Judge Hillary J. Crain, retired, is serving as judge pro tempore, by special appointment of the Louisiana Supreme Court.
[2] Included in this group were Exxon Corporation and Taylor Energy Company.
[3] The transferees of the former working interest owners were Flash Gas & Oil Northeast, Inc. and Ashlawn Corporation.
[4] Among the former overriding royalty owners were: Margaret Robichaux Baudoin, Myra Robichaux Blanchard, Mary Robichaux Boudreaux, Madeline Elizabeth Simeon Chastain, Russell M. Frankel, Sherry Frankel Greenwald, Sheryl Stafford Overstreet, Dorothy Pecot Norwood, Richard C. Pecot, The Estate of Wylmer I. Pool, through Wylmer Crenshaw Pool as Executor, First National Bank of Commerce, as Trustee of the Wylmer Crenshaw Pool Trust No. 3, David J. Robichaux, Jr., Mary Weimer Robichaux, Jackie McPherson, as Executrix of the Succession of Joy B. Shalett, Monte C. Shalett, Individually and as Trustee for the Monte C. Shalett Trust, Marguerite Pecot Singleton, and Don Stafford.
[5] The petition for declaratory judgment named Vintage Petroleum Corporation and Russell Frankel, as Trustee of the Sherry Gwynne Frankel Louisiana Testamentary Trust, as other parties who may have an interest in the "Lease."
[6] Defendants submitted an initial and supplemental affidavit by Ellis.
[7] Attached to Ellis's affidavit was a history, outlining operations in the Clovelly Field from June, 1991, through October, 1992.
[8] Attached to Kirby's affidavit were various invoices for welding services.
[9] Attached to Dufrene's affidavit were various invoices for equipment.
[10] Attached to Bollinger's affidavit were various invoices for work performed by Bollinger Workover, Inc.
[11] Attached to Haller's affidavit were the projected field and well rework/workover plans for the Clovelly Field.
[12] Attached to Agnew's deposition were memoranda regarding production and lease maintenance in the Clovelly Field.
[13] Attached to Stringer's deposition excerpt were several service order and operation reports from November and December, 1991.
[14] Attached to Ellis's deposition were fifty-six (56) exhibits, ranging from abandon well and recondition well requests, problem and wireline well service reports, notes and memos, service order and operation reports, laboratory analyses, daily reports and operation summaries, and invoices.
[15] Attached to Elam's deposition were various notes and correspondence, addressing shut-in payments to maintain the leases in the Clovelly Field.
[16] Attached to Agnew's deposition were well status history reports for the Clovelly Field from November, 1991, through August, 1992, correspondence and notes regarding lease maintenance, well problem reports, workover routing slips, well recondition reports, reservoir considerations, performance analyses, and wellbore sketches.
[17] Attached to Stringer's deposition were problem well reports, service order and operation reports, and notes.
[18] Attached to Raggio's deposition were his resume, memos, and synopses of wireline and related reports.
[19] Attached to Hise's deposition were his resume, a list of his prior trial and deposition testimony, a time line of the Clovelly Field activity, daily reports from Bollinger Workover, Inc., and well calculation for one of the wells in the Clovelly Field.