YELYERTON, Judge.
In this suit to cancel a mineral lease and obtain an accounting of production, the trial judge found that the owners of the lease failed to commence reworking operations within 90 days of the cessation of production, and that the lease thereby terminated. From a judgment in favor of the lessors, the owners of the lease and their contract operator, the defendants, have appealed. We affirm.

The Parties, Pleadings, and Judgment

The plaintiffs are 23 lessors (the Jardell heirs) of a lease covering 20 acres of land in Calcasieu Parish, along with Reedland Energy, Inc. which has obtained a subsequent lease over the property. The petition alleged that the lease had terminated for lack of efforts to restore mineral production within 90 days after the cessation of production under the provisions of the lease. The plaintiffs also sought an accounting for all profits from the lease termination date and for damages to a hydrocarbon reservoir allegedly caused by defendants. Made defendants were 13 working interest owners including the lessee Annco Petroleum Co., Inc., plus the contract operator of the lease, Auster Oil & Gas, Inc., among others. (Because of their number, and because an identification of all parties involved in the case is not important to the decision, they will not all be named.) After a trial on the merits, the trial court rendered judgment in favor of the plaintiffs against 12 of the 13 working interest owners in the lease as well as Auster, decreeing that the oil, gas and mineral lease expired and terminated 90 days from and after June 17, 1981, and ordering the defendants to render an accounting to plaintiffs for all production from the land covered under the lease from September 16, 1981. The suit against the defendant Wanda Bertrand was dismissed for lack of personal jurisdiction. All other claims were dismissed with prejudice. The remaining 12 working interest owners and the contract operator filed this appeal.

The Lease

The lease was executed on January 15, 1970. Only one well was drilled, the Roy A. Jardell No. 1. It was completed on June 10, 1970, and later that year a 6.94 acre production unit was established which included a portion of adjoining property.
In 1979 the lessees contracted with Aus-ter Oil and Gas, Inc., to conduct the necessary operations on the lease.
Production from the well ceased on June 17, 1981. Production was restored on December 10, 1981.
The lease provided:
“6. After the discovery and production of oil, gas or any other mineral in paying quantities, either on the leased premises or on lands pooled therewith, the rights granted shall be maintained in effect during and after the primary term and without the payment of the rentals hereinabove provided for so long as oil, gas or some other mineral is being produced in paying quantities, or Lessee is *1120 carrying on operations with reasonable diligence looking to the production thereof: It is provided, however, that if after the discovery and production of oil, gas or other minerals in paying quantities, the production thereof should cease from any cause this lease shall terminate unless Lessee resumes or restores such production, or commences additional drilling, reworking or mining operations within ninety (90) days thereafter and continues operations without the lapse of more than ninety (90) days between abandonment of work on one well and commencement of reworking operations or operations for the drilling of another, in an effort to restore production of oil, gas or other minerals, ...”

Issues

The principal issue on this appeal is whether the defendants complied with the lease provision requiring that they commence “reworking operations” within 90 days after the cessation of production in order to continue the lease in effect. Other arguments involve the equities of cancellation on the facts, and whether appellants are entitled to retain the 6.94 acre unit under the lease contract.

The Evidence

Auster conducted several operations upon the property between June 17, 1981, (the date production ceased) and December 10, 1981, (the date production resumed). John Hogan, President of Auster, testified that on June 19, 1981, Auster contracted with Carlyss Welding & Construction Company to repair a broken PVC pipeline located on the salt water dump line. The break was caused by livestock crossing the line. Carlyss also cleaned up the salt water which had leaked from the pipeline. This pipeline serviced two wells, the Roy A. Jardell No. 1 well and the Jules Jardell well. On cross-examination Mr. Hogan stated that the working interest owners of the Roy A. Jardell well were not billed for this repair, only the working interest owners of the Jules Jardell well were charged for this service.
On June 26, 1981, a leak on the salt water line was repaired and a vacuum truck had to pick up a quantity of spilled salt water. On July 7, 1981, the pumping unit was repaired due to failure of the tail bearings. This was a two-day job. On August 12, 1981, the lease site was cleaned up by a bulldozer.
Mr. Hogan testified that on September 14 or 15, 1981, Auster had Tiger Well Service Company pressure test the downhole tubing in the well. This test confirmed that the well had a hole in the tubing, which was what Auster suspected due to the prior history of tubing failure with the well. Auster decided that the entire string of tubing needed replacing. On cross-examination of Mr. Hogan it appears that Auster did not receive an invoice from Tiger for this testing. Mr. Hogan stated that Tiger did not charge Auster for the testing and that he did not believe Tiger would have a record of this operation. No one from Tiger was called to testify. The evidence showed that on prior occasions when the tubing had failed Tiger charged Auster for pressure testing the tubing. When asked why Auster waited three months from cessation to have Tiger test the tubing Mr. Hogan stated that Tiger was doing other jobs, but admitted Auster could have called in someone else. Mr. Ray McClelland, field superintendent for Auster, also testified that Tiger had tested the well to see if holes were in the tubing.
Under its contract Auster paid all the expenses arising from the maintenance of the lease and operation of the well, and then charged the working interest owners their pro-rata share of the expenses. If a certain expense exceeded more than $10,-000, Auster was required to obtain the consent of the working interest owners. This was done by mailing the working interest owners an “Authority for Expenditure” (AFE) which explained the necessary expenses. On October 19, 1981, Auster prepared the AFE form and mailed it to the working interest owners seeking their approval of an estimated $18,000 expenditure to replace the entire string of tubing.
*1121 Mr. Hogan testified that on November 25, 1981, a pump and tank were moved onto the site. On cross-examination Mr. Hogan stated that this work was charged to another well according to the invoice and that he may be wrong that this work occurred at the Roy A. Jardell well. In early December Mr. Hogan stated a new gate was built due to vandalism. On December 7, 1981, the workover rig was moved in to replace the tubing. On December 8, 1981, the operation of replacing the entire string of tubing was completed. On December 10 or 11 production resumed.
On February 20, 1982, the lessors sent a demand letter to Buttes Resources Company, claiming that the lease had terminated for lack of production or reworking operations within a 90 day period.

The Expert Testimony

The expert testimony consisted of the testimony of Thomas Blankenship, Jr., an independent oil and gas operator, and Jacob Sulzbach, a petroleum engineer. Both experts testified that a workover operation would consist of work performed on a well in an effort to restore or enhance production which would also include preparatory work. However, Mr. Blankenship was of the opinion that replacement of wornout parts in a pumping unit, the repair of a lease gate, and the repair of the salt water disposal line would not be considered part of a workover operation where production had ceased due to tubing failure. He stated that the December 1981 replacement of the downhole tubing was a workover operation. Mr. Sulzbach stated that the work-over operation started when Auster decided they had to do something to resume production. He stated the first step in regaining production occurred with the repair of the pumping unit and the second step was the September testing of the downhole tubing. The next step would be getting the AFE approval of the working interest owners for the expenditures and the final step would be replacing the tubing if approved.

The Trial Court’s Opinion

Based on this testimony the trial court determined that the lease expired due to the failure of defendants to conduct work-over operations within a 90 day period from the cessation of production. The court found that the activities which occurred between the cessation of production and the December replacement of the tubing were not a continuing or diligent effort on the part of the defendants to constitute a reworking of the well.
DISCUSSION OF THE ISSUES
I. Whether Defendants Timely Began a Workover Operation
The appellants contend that the trial court gave a wrong definition to the term “reworking operation”, and thus erred in holding that Auster’s various operations from June 1981 through December 1981 were part of an overall workover operation.
In determining whether the operations conducted by Auster from June 17,1981, to December 7, 1981, constituted “reworking” operations sufficient to maintain the lease, the case of House v. Tidewater Oil Company, 219 So.2d 616 (La.App. 3rd Cir.1969), writ refused, 221 So.2d 516 (La.1969), offers an extensive discussion of the term “reworking.” In that case the court stated:
“There are at least three Louisiana cases which have considered the question of ‘reworking’. Most important of these is Texas Company v. Leach, 219 La. 613, 53 So.2d 786 (1951). The facts showed that the well gradually decreased in production to five barrels of oil per day. Finally, the tubing burst. The operators closed the well down and contracted with a drilling company to work the well over. During the 60-day delay, provided by the habendum clause, the following operations were conducted in preparation to restore production: Relegged derrick; pulled tubing; strengthened and reinforced bridge; doped tubing and rods; repaired gas lines; racked and doped tubing; repaired roads and bridges; prepared for cable tooling. After the 60-day period, the operations continued until the well was brought back into production.
*1122 “In holding that the operations conducted by the Texas Company constituted reworking operations sufficient to maintain the lease beyond its primary term, the court held:
‘We believe that the operations conducted by the Texas Company between September 10 and November 26, 1947, were sufficient to conform with the provisions of their contract. Operations of a similar nature under a lease which obligated the lessee to “commence operations” within a certain period of time “by drilling, boring or mining for oil” have been held to be the commencement of work “which satisfied the condition of the lease”. See Hudspeth et al. v. Producers’ Oil Co., et al., 134 La. 1013, 64 So. 891, 893.’
“In Johnson v. Houston Oil Company of Texas, 229 La. 446, 86 So.2d 97 (1956), the lease provided for termination unless oil or gas was being produced in paying quantities or ‘drilling or reworking operations’ were being conducted on June 27, 1954. A well drilled during the latter part of 1953 showed the presence of oil, but it was plugged with concrete. On the crucial day, June 27, 1954, the operator moved a drilling rig, pump, rotary and kelly joint to the well site, assembled them, and commenced to drill out the cement plug. Production was actually obtained. The court held:
‘Under these circumstances we would not be warranted in disturbing such findings of fact; and we hold, as did the trial judge, that plaintiff was actually engaged in reworking operations on June 27. See Texas Co. v. Leach, 219 La. 613, 53 So.2d 786.’
“In Harry Bourg Corporation v. Union Producing Company, 197 So.2d 172 (La.App. 1st Cir.1967, writ refused), the lease provided for the periodic commencement of operations to drill a new well or ‘rework’ an existing well. The operations in question consisted of placing a cement plug at the 14,800 feet depth in an existing well and moving up in the hole and making new perforations at 14,500 feet. Three experts testified this was ‘reworking’ and defined the term. Mr. Drew Cornell, a petroleum engineer of 22 years experience, defined ‘reworking’ as: ‘It is to restore or increase production of a well that has been drilled, usually the second attempt.’ Mr. L.C. Aycock, a petroleum geologist, testified: ‘The word means to work again on a well. It is used in reference to work on wells that have never produced or work on wells that have produced, used in connection with a well that has never produced. * * * In a well that has produced it would be an operation when the well came off of production or ceased production, and it would be an operation to maintain, restore, improve production. * * * ’ Mr. Donald Mast, a geologist, stated: ‘My understanding of the term is any process or procedure which you may undertake to either regain, increase or create new production in a well.’
“In the Harry Bourg Corporation case, the court held:
‘We find from the testimony of the three experts, quoted supra, that the word “rework” has a definite, even though multiple, meaning in the oil and gas industry, and accordingly we are bound to accept this meaning in the sense in which it was used on this compromise agreement, the subject matter of which was an oil, gas and mineral operation.’
“We note particularly that not one of the three cited cases, nor any of the experts mentioned therein, limits the term ‘reworking’ to operations which affect the ability of the formation to feed into the well bore. In the Harry Bourg Corporation case, which quotes the expert testimony, the definition of ‘reworking’ given by these witnesses is substantially the same as that given by defendants’ experts in the present case, i.e., it is an operation to obtain production in a well which was completed but never produced or to maintain, restore or improve production in a well which ceased to produce and has been abandoned.
*1123 “Plaintiffs cite several cases from other states which discuss ‘reworking’. Not one of them restricts the term to operations which ‘affect the ability of the formation to feed into the well bore’, as contended by plaintiffs’ experts. Furthermore, we find no such restricted definition suggested in either the text or the citations in Summers, Oil and Gas, Vol. 2, Sections 305 and 349. In short, plaintiffs have not cited, nor have we been able to find, any authority which supports their definition.
“Like the courts in the three cited Louisiana cases, we also will not attempt to give a comprehensive definition of ‘reworking operations’ applicable in every case. Each case must depend upon its own facts, in the light of the opinions of the expert witnesses who testify. In our view, the operations conducted by Mr. Waterbury in the present case clearly constituted reworking. We attach particular significance to the following facts: The well had actually ceased to produce and had been abandoned by the original operator, Tidewater. Mr. Waterbury purchased the leases from Tidewater and, as a new operator, commenced efforts to restore the well to production. He and a crew of men repaired one mile of board road and built completely new triple matting around the well to support heavy equipment which might be needed. After the wire line service unit was successful in removing paraffin and debris from the well, it actually returned to production. Waterbury then had to install new flow lines and a new tank battery. These operations were all conducted reasonably, deligently and in good faith, and were actually successful in restoring production. Certainly the operations conducted by Waterbury were more than routine maintenance by an operator to maintain production.” (Emphasis ours; footnote omitted)
Considering the facts of this case and the opinions of the expert witnesses, we agree with the trial court’s conclusion that the lease had expired for failure to conduct reworking operation within a 90 day period.
The well ceased producing on June 17, 1981. The trial court found that the well ceased production due to tubing failure. The only work activities which occurred at the well within 90 days of the cessation were repair of salt water disposal lines, repairs made to the jack pump, the clean up of the lease site, and possibly the pressure testing of the tubing. Mr. Blankenship was of the opinion that the replacement of worn parts on the pumping unit, the cleaning up of the lease site, and the repair of a break in the salt water disposal line would not be considered part of a workover operation where a well ceased production due to holes in the tubing.
As to the pressure test conducted on the tubing almost three months after the well stopped producing, the trial court stated that “there is some question as to the exact date” that this activity occurred. Mr. Hogan stated that this activity occurred either on September 14 or 15 just prior to the expiration of the 90 day period. However, he stated that Tiger did not bill Auster for this service. When asked why Auster waited approximately three months to test the tubing, Mr. Hogan testified that Tiger was working on other jobs but that they could have gotten another company to do the test. The evidence reveals that Tiger billed Auster for pressure testing the tubing on other occasions.
If in fact the decision to replace the entire string of tubing was made as a result of such a test, on such a date, Auster waited over a month to prepare and send out the AFE to the working interest owners. It was not until three months after this possible testing that Auster began actual workover operations on the well.
Even assuming that the pressure testing of the tubing occurred within 90 days after the cessation of production, we find that the defendants were not reasonable or diligent in conducting such activity considering the fact that the well had a history of tubing failure and that defendants waited almost three months before conducting a *1124 test to merely confirm that the tubing had failed.
Considering these facts and the opinion of Mr. Blankenship, we find that these activities did not constitute a “reworking” of the well to restore production, and that therefore the trial court did not err in finding the lease had expired on September 15, 1981.
II. Retention of the 6.94 Acre Unit
The defendants also argue that if the lease terminated the defendants would be entitled to retain the 6.94 acre unit under the following provision of the lease:
“In the event of the forfeiture of this lease for any cause, Lessee shall have the right to retain around each well then producing oil, gas or other minerals or being drilled or worked on the number of acres fixed and located by the spacing or unit order of any Regulatory Body of the State of Louisiana or of the United States under which said well is being drilled or produced, or if said well has been or is being drilled on a unit pooled by Lessee as provided herein, then Lessee may retain all of the acreage comprising said pooled unit; and if no spacing order has been issued nor any pooled unit established, then Lessee shall have the right to retain forty (40) acres surrounding each oil well and 160 acres surrounding each gas well then producing or being drilled or worked on, such forty acres or 160 acres to be in as near a square form as is practicable.”
In the present case we have found the present lease expired on September 15, 1981. At that time the well was not producing or being drilled or worked. Therefore this provision does not apply.
For these reasons the judgment of the trial court is affirmed.
III. An Injustice?
Appellants’ remaining contentions may be grouped together as presenting the argument that cancellation is a harsh remedy, and unjust on the facts, especially considering that the lessees never complained about the delay and waited until two and a half months after production was restored before making a demand for lease cancellation.
According to La.R.S. 31:133 “[a] mineral lease terminates at the expiration of the agreed term or upon the occurrence of an express resolutory condition.” The provision here stating that should production cease for any cause “this lease shall terminate unless Lessee ... commences additional drilling, reworking or mining operations within ninety (90) days thereafter ...” is an express resolutory condition that would terminate the lease. See Woods v. Ratliff, 407 So.2d 1375 (La.App. 3rd Cir.1981). Under such circumstances the lessor need not place the lessee in default as a prerequisite to a suit seeking a declaration that the lease has been dissolved. La.R.S. 31:133 and the comments under that article; and Woods v. Ratliff supra.
For the reasons above stated, the judgment of the trial court is affirmed at appellants’ costs.
AFFIRMED.
DOMENGEAUX, J., dissents and assigns reasons.