**ROEMER OIL COMPANY, a Colorado corporation, Appellant (Plaintiff),**

v.

**AZTEC GAS & OIL CORPORATION a Nevada corporation, Appellee (Defendant).**

No. 93–266.

Supreme Court of Wyoming.

Dec. 1, 1994.

Joseph E. Hallock of Stevens, Edwards & Hallock, P.C., Gillette, Michael Rosenthal of Hathaway, Speight, Kunz & Trautwein, Cheyenne, as local counsel; and Timothy R. Beyer and Stephen D. Gurr of Baker & Hostetler, Denver, CO, for appellant.

Jon B. Huss of Brown & Drew, Casper, for appellee.

Before GOLDEN, C.J., and THOMAS, MACY, and TAYLOR, JJ., and McEWAN, District Judge Ret.

TAYLOR, Justice.

The primary question in this appeal is whether the term "reworking" in an oil and gas operating agreement is ambiguous in meaning. The district court determined that the term was not ambiguous and that, under the terms of the agreement, appellee was entitled to summary judgment.

We reverse.

## I. ISSUES

Appellant, Roemer Oil Company (Roemer), raises these issues:

1. Whether the trial court erroneously determined as a matter of law that the terms "rework" and "reworking" contained in Section 11 and Section 12 of the Model Form Operating Agreement between the parties are not ambiguous.

2. Whether the definition of "reworking" adopted by the lower court improperly nullifies the provisions in Section 11(c) of the Operating Agreement and imposes impractical obligations upon the Operator contrary to the clear intent of the parties.

3. Whether it was error for the trial court to enter summary judgment in the face of disputed issues of material fact surrounding the parties' understanding of the ambiguous terms "rework" and "reworking" contained in Sections 11 and 12 of the Operating Agreement.

4. Whether it was error for the trial court to enter summary judgment given the genuine triable issues of material fact surrounding the determination of whether each of the numerous projects performed by Roemer on the Subject Wells constituted "rework" or "reworking" under Section 11 or 12 of the Operating Agreement.

Appellee, Aztec Gas & Oil Corporation (Aztec), summarizes the issues as follows:

A. *Did the Trial Court Err in Granting Summary Judgment for Defendant Aztec?*

1. Did Roemer's workovers and repairs of oil and gas wells constitute "reworking" a well for purposes of a joint operating agreement's consent provisions?

2. Is summary judgment for Aztec sustainable on other grounds raised before the trial court?

a. Did Roemer violate Section 11(c) of the joint operating agreement by failing to provide notice and receive prior authorization of projects reasonably expected to exceed $5,000.00 in cost?

b. Did Aztec have an interest in any of the Subject Wells other than Apache No. 7?

c. Did Roemer breach its duty to act as a prudent operator?

d. Are Roemer's unjust enrichment and attorneys fees claims flawed?

## II. FACTS

On August 18, 1967, Apache Corporation entered into an Operating Agreement with Woods Petroleum Corporation. Roemer was successor to Apache and was the operator under that agreement from September 1, 1990 through November 1, 1992. Aztec succeeded to the interest of Woods Petroleum Corporation by sale executed on March 9, 1990. At that time, the wells in controversy were shut in. Roemer determined that four of the wells were capable of being produced economically and returned three of the wells to production in 1991. Roemer did not consider the work it was doing to be "reworking" and, pursuant to Section 11(c) of the Operating Agreement, submitted joint interest billings to Aztec for its share of the expenditures incurred in accomplishing that work. Initially, Aztec paid its share of the costs, but then discontinued paying, asserting, in the alternative, that it had no interest in some of the wells and that Roemer had failed to seek Aztec's approval, as required by the Operating Agreement, prior to accomplishing the work for which Aztec was billed. Roemer filed this action to recover from Aztec $41,508.10 in unpaid billings.

The controversy centers on Sections 11 and 12 of the Operating Agreement:

## 11. LIMITATION ON EXPENDITURES

Without the consent of all parties: (a) No well shall be drilled on the Unit Area except any well expressly provided for in this agreement and except any well drilled pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the drilling of a well shall include consent to all necessary expenditures in the drilling, testing, completing, and equipping of the well, including necessary tankage; (b) No well shall be reworked, plugged back or deepened except a well reworked, plugged back or deepened pursuant to the provisions of Section

12 of this agreement, it being understood that the consent to the reworking, plugging back or deepening of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well to produce, including necessary tankage; (c) Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of *Five Thousand and No/100* Dollars (*$5,000.00*) except in connection with a well the drilling, reworking, deepening, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that in case of explosion, fire, flood, or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property, but Operator shall, as promptly as possible, report the emergency to the other parties. Operator shall, upon request, furnish copies of its "Authority for Expenditures" for any single project costing in excess of *$5,000.00*.

## 12. OPERATIONS BY LESS THAN ALL PARTIES

If all the parties cannot mutually agree upon the drilling of any well on the Unit Area, or upon the reworking, deepening or plugging back of a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities on the Unit Area, any party or parties wishing to drill, rework, deepen or plug back such a well may give written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days (except as to reworking, plugging back or drilling deeper, where a drilling rig is on location, the period shall be limited to forty-eight (48) hours exclusive of Saturday or Sunday) after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation.

Failure of a party receiving such a notice to so reply to it within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation.

Section 12 goes on to provide that only consenting parties receive the benefit of any production which might result from a given operation. Aztec received its share of production, but production amounted to less than one-third of the costs of Roemer's work.

Roemer contended, and presented affidavits and other evidence, that the jobs it performed were merely "projects" to repair production equipment which it reasonably estimated to cost less than $5,000.00 per project and, therefore, it did not need advance approval from Aztec in order that Aztec be bound to pay its share of the expenses incurred. Moreover, Roemer maintains that Aztec knew of Roemer's repair projects on the subject wells and did not complain until it became aware of the results, i.e., that production was still not economic. Aztec contended, in part, that the "projects" done by Roemer were "reworking" and, hence, Roemer was obliged to seek Aztec's advance approval in order that it be bound to pay a share of the expenses.

Aztec filed a motion for summary judgment. Finding there was no genuine issue of material fact, the district court granted that motion. The district court reasoned that Section 11(b) of the Operating Agreement provided, in basic part:

"Without the consent of all parties: (b) no well shall be reworked ... except a well reworked ... pursuant to the provisions of Section 12 of this agreement ..." Section 12 in pertinent part provides as follows: "If all parties cannot mutually agree ... upon the reworking ... of ... a well jointly owned by all the parties and not then producing in paying quantities ... any party or parties wishing to ... rework ... such a well may give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation." * * * The expressed provision of

Section 11(b) prohibits such a reworking of a well. "Reworking" appears to be a term of art in the oil and gas industry and cases involving oil and gas. The court was referred to and consulted the *Williams and Myers* [sic] treatise which indicates that reworking is done to restore production that has ceased. The record clearly indicates that all six wells involved had not been producing for a substantial period of time * * *.

\* \* \* \* \* \*

Basing the decision as I have on Section 11(b) and Section 12 of the Operating Agreement and with plaintiff's failure to give notice thereunder, plaintiff cannot now recover from defendant. It is unnecessary for the court to rule on any of the parties' other contentions.

## III. DISCUSSION

In evaluating the propriety of a summary judgment, we determine whether there are no genuine issues of material fact and whether, as a consequence, the prevailing party is entitled to judgment as a matter of law. *Equality Bank of Evansville, Wyo. v. Suomi*, 836 P.2d 325, 328 (Wyo.1992); W.R.C.P. 56(c). Summary judgment is appropriate when the terms of the parties' agreement do not raise issues of material fact. *J & M Investments v. Davis*, 726 P.2d 96, 98 (Wyo.1986). This court accords no deference to the district court's determination of an issue of law. *Coones v. F.D.I.C.*, 848 P.2d 783, 795 (Wyo.1993) (*quoting Powder River Oil Co. v. Powder River Petroleum Corp.*, 830 P.2d 403, 406–07 (Wyo.1992)). Unless ambiguous, our inquiry is confined to the language contained in the contract. *Union Pacific Resources Co. v. Texaco, Inc.*, 882 P.2d 212, 220 (Wyo.1994). The meaning of a word in a contract is what the parties intended to convey.

The district court appears to have relied upon a very small portion of the definition found in the *Williams and Meyers* treatise, which we set out in its entirety:

Reworking operations

Work performed on a well after its completion, in an effort to secure production where there has been none, restore production that has ceased or increase production. Cleaning out a hole that has silted up is a typical reworking operation. In *Rogers v. Osborn*, 152 Tex. 540, 261 S.W.2d 311, 2 O. & G.R. 304, 1439 (1953), the trial court defined reworking operations as follows:

"'re-working operations' ... means actual work as operations which have theretofore been done, being done over, and being done in good faith endeavor to cause a well to produce oil and gas or oil or gas in paying quantities as an ordinarily competent operator would do in the same or similar circumstances."

The appellate court neither approved nor disapproved of this definition. In the same case, the court held that *Periodic Flowing* (*q.v.*) or bleeding a well could amount to reworking operations, where the jury so found.

See also *Johnson v. Houston Oil Co.*, 229 La. 446, 86 So.2d 97, 5 O. & G.R. 1169 (1956); Ariz.R.S. § 27–551.

The legal definition of the term is important because many leases contain clauses such as or similar to the following:

"If prior to discovery of oil or gas on the land lessee should drill a dry hole thereon, or if after discovery of oil or gas the production thereof should cease, this lease shall not terminate if lessee commences additional drilling or *reworking* operations within sixty days thereafter.... If at the expiration of the primary term, oil, gas or other mineral is not being produced on the land but lessee is then engaged in drilling or *reworking* operations thereon, this lease shall remain in force so long as such operations are prosecuted with no cessation of more than thirty days...."

The term "reworking" is defined in one agreement form as "all operations designed to secure, restore or improve production through some use of a hole previously drilled, including but not limited to, mechanical or chemical treatment of any horizon, deepening to test deeper strata, plugging back to test higher strata, etc."

Myers, *The Law of Pooling and Unitization* § 15.06 at p. 601 (2d ed. 1967).

*Sheffield v. Exxon Corp.*, 424 So.2d 1297, 76 *O. & G.R.* 419 (Ala.1983), in analyzing the meaning of this term, declared:

"The crucial test which must be met for an activity to constitute reworking is whether the operation is associated or connected with the physical site of the well or the unit. Additionally, the operation must be intimately connected with the resolution of whatever physical difficulty caused the well to cease production."

In *Harry Bourg Corp. v. Union Producing Co.*, 197 So.2d 172, 27 *O. & G.R.* 20 (La.App.1967) *writ. ref'd*, 250 La. 903, 199 So.2d 917, 27 *O. & G.R.* 28 (1967), the court concluded that "the word 'rework' has a definite, even though multiple, meaning in the oil and gas industry" and it rejected the contention that "reworking" required that activities "be of a drilling nature (either sidetracking or deepening)." The "reworking" in the instant case involved operations causing a well to produce gas from 14,550 feet after the original production from sand at 14,800 feet ceased.

In *Lone Star Producing Co. v. Walker*, 257 So.2d 496 at 500, 41 *O. & G.R.* 350 at 358 (Miss.1971), the court declared that it was not absolutely necessary that a work over rig be on the well site as a necessary incident to a reworking operation, and then observed that:

"It would be difficult, if not impossible, to formulate a rule that would with exactness define reworking operations such as those contemplated by the terms of the leases in question because the problems of capturing and producing oil and gas located thousands of feet below the surface of the earth are many and varied. Reworking operations may encompass testing, evaluation and other acts performed necessary to reworking a given well, and each case will have to be considered in the light of facts peculiar to that operation. One of the prime requirements is that the acts of the operator constitute a bona fide effort to rework a given well."

*Serhienko v. Kiker*, 392 N.W.2d 808, 91 *O. & G.R.* 278 (N.D.1986), concluded that operations on other premises, on the success of which operation on the leasehold was contingent, did not constitute reworking operations on the leasehold.

*Cox v. Stowers*, 786 S.W.2d 102, — *O. & G.R.* — (Tex.App., Amarillo, 1990), defined this term as "any and all actual acts, work or operations in which an ordinarily competent operator, under the same or similar circumstances, would engage in a good faith effort to cause a well or wells to produce oil or gas in paying quantities." Based on this definition, the court concluded that evidence was sufficient to justify that the lessee's treatment and activities were sufficient to constitute good faith reworking activities.

*Burns v. Louisiana Land & Exploration Co.*, 870 F.2d 1016, 106 *O. & G.R.* 547 (5th Cir.1989), concluded that in the context of the specific use of the phrase "completion of a dry hole" in a lease, "completion of a dry hole happens after unsuccessful drilling *or reworking.*"

*Pshigoda v. Texaco, Inc.*, 703 S.W.2d 416, 90 *O. & G.R.* 135 (Tex.App., Amarillo, 1986, error ref'd n.r.e), concluded that expenses incurred in reworking an oil well were properly considered as capital expenses rather than operating and marketing expenses and hence were not to be considered in determining whether production was in paying quantities for purposes of the habendum clause of the lease.

See also *Jardell v. Hillin Oil Co.*, 476 So.2d 1118, 89 *O. & G.R.* 84 (La.App.1985), *rev'd and rendered*, 485 So.2d 919, 89 *O. & G.R.* 99 (La.1986), for a detailed discussion of what constitutes reworking operations.

*Del-Ray Oil & Gas, Inc. v. Henderson Petroleum Corp.*, 797 F.2d 1313, 92 *O. & G.R.* 96 (5th Cir.1986), noted, 47 *La.L.Rev.* 661 (1987), declared that under *Jardell* reworking need not involve additional drilling and that *Jardell* does not suggest that reworking must take place below the ground.

The definition in this MANUAL was quoted in *House v. Tidewater Oil Co.*, 219 So.2d 616 at 622–623, 33 *O. & G.R.* 268 at

279 (La.App.1969), *writ refused,* 253 La. 1081, 221 So.2d 516 (1969).

8 Howard R. Williams and Charles J. Meyers, *Oil and Gas Law, Manual of Oil and Gas Terms* 1071–74 (1991) (emphasis in original); and, *see Texstar North America, Inc. v. Ladd Petroleum Corp.,* 809 S.W.2d 672, 677 (Tex.App.1991).

In addition, the *Williams and Meyers* treatise refers the reader to the definition for "work overs" in connection with "reworking operations." 8 Williams and Meyers, *supra,* at 1074. The definition of "work overs" refers the reader to "production enhancement procedures." *Id.* at 1380. Each of these terms seems to shed some light on what the parties to this contract might have intended.

■ That, of course, leads us to our primary task in an appeal such as this, i.e., a determination of what the parties intended by the language employed in their contract. *See Union Pacific Resources Co.,* 882 P.2d at 219–20; and *Prudential Preferred Properties v. J and J Ventures, Inc.,* 859 P.2d 1267, 1271 (Wyo.1993). It is readily evident from the definition of "reworking" in 8 Williams and Meyers, *supra* at 1071–74 that it has no precise meaning; rather, its meaning is, most frequently, a function of the context in which it is used. We are persuaded that its meaning in the circumstances of this case is, at best, uncertain and should be presented to a fact finder for resolution. *See Eisenbarth v. Hartford Fire Ins. Co.,* 840 P.2d 945, 950–51 (Wyo.1992); 3 Arthur Linton Corbin, *Corbin on Contracts* § 554 (1960) (and see 1993 Supp. by the Publisher's Editorial Staff); and 17A C.J.S. *Contracts,* §§ 300–302(1) (1963). It is also important to note that the contract in question was entered into on August 18, 1967, and the parties were Apache Corporation and Woods Petroleum Corporation. Neither of the litigants was a party to the original contract. When that contract was signed, all the wells in question were producers. Moreover, it is unmistakable that the $5,000.00 limitation imposed by Section 11(c) of the Operating Agreement affected the operator's discretion more profoundly in 1991 than it did in 1967.[1] It is apparent the Operating Agreement contemplated that some limited "projects" could be undertaken without obtaining Aztec's consent.[2] The line to be drawn between what the parties meant by "projects" and what they meant by "reworking" must, of necessity, be drawn by a fact finder.

Aztec contends the district court can be affirmed on other grounds. It is evident from what we have said above that there are disputed facts as to whether Roemer violated Section 11(c) of the Operating Agreement, whether its estimates were reasonable, and whether Aztec "opted out" of the work done by Roemer. Aztec also contends that it had no interest in some of the subject wells; in particular, Apache No. 7. It is evident even from Aztec's own argument that the facts in this regard are, at least at this juncture, very much in dispute. We need not address the other issues posed by Aztec in its appellate brief.

## IV. CONCLUSION

We hold there are genuine issues of material fact which preclude summary judgment. The order on summary judgment, in which the district court found generally in favor of Aztec and generally against Roemer, is reversed and the matter is remanded to the district court for further proceedings consistent with this opinion.

---

1. Had the parties renegotiated this contract in 1991, so as to inflate the $5,000.00 limitation established in 1967 to a current level, Roemer's discretion to do projects would have had to have been increased to approximately $20,325.00.

2. Aztec misapprehends the wording of Section 11(c) of the Operating Agreement. In its appellate brief, Aztec states: "Section 11(c) prohibits the operator from undertaking any project expected to cost more than $5,000, unless the project is 'connected with' a well where reworking, drilling, etc. has already been approved." Parsed, that section provides that the operator must obtain consent for any project reasonably estimated to cost over $5,000.00, unless it is done in connection with drilling, reworking, deepening or plugging back which has been previously authorized by the Operating Agreement.