2003 WY 41

**WADI PETROLEUM, INC., a Texas corporation Appellant, (Plaintiff),**

v.

**ULTRA RESOURCES, INC., a Wyoming corporation; and Questar Exploration & Production Company, a Texas corporation, Appellees, (Defendants).**

No. 02–22.

Supreme Court of Wyoming.

March 26, 2003.

Terry W. Mackey and David Evans of Hickey, Mackey, Evans & Walker, Cheyenne, Wyoming, Representing Appellant. Argument by Mr. Mackey.

Gerald Mason of Mason & Mason, P.C., Pinedale, Wyoming; and George W. Mueller of Burns, Wall, Smith & Mueller, P.C., Denver, Colorado, Representing Appellee Ultra Resources, Inc. Argument by Mr. Mason.

Thomas Reese of Brown, Drew & Massey, LLP, Casper, Wyoming; and Brad W. Breslau of Grund & Breslau, P.C., Denver, Colorado, Representing Appellee Questar Exploration & Production Company. Argument by Mr. Reese.

Before HILL, C.J., and GOLDEN, LEHMAN, and VOIGT, JJ, and BURKE, DJ.

HILL, Chief Justice.

[¶ 1] Appellant, Wadi Petroleum, Inc. (Wadi), seeks review of the district court's order granting a partial summary judgment[1] in favor of Appellees, Ultra Resources, Inc. (Ultra) and Questar Exploration & Production, Inc. (Questar). The parties disagreed about the meaning of language used in an assignment of an oil and gas lease concerning the quantum of an overriding royalty interest. The district court heard and relied on extrinsic evidence in order to resolve what it considered an inherent ambiguity in the language used in the assignments. It is the

---

1. The district court's order included the required certification:

   **Rule 54. Judgment; costs.**
   
   . . . .
   
   (b) Judgment upon multiple claims or involving multiple parties. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, **the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just** reason for delay and upon an express direction **for the entry of judgment.** In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

   W.R.C.P. Rule 54(b). (Emphasis added.)

district court's reliance on such extrinsic evidence, rather than only looking at the four corners of the assignment, which is the central issue in this appeal. Wadi asserts that the plain language of the assignment is unambiguous, whereas Ultra and Questar contend that the language used is incomplete and indefinite, and its precise meaning cannot be ascertained with certainty unless extrinsic evidence is considered.

[¶ 2]   We will affirm.

[¶ 3]   Wadi proposes these as the issues to be decided:

I.   Can an assignment filed of record transferring oil and gas interests be rendered ambiguous via the testimony of experts regarding industry custom and practice?

II.   Is an executory contract of sale of a real property interest merged into the transfer document filed of record?

III.   Is the most persuasive extrinsic evidence used in determining the intent of the parties documents authored by the parties contemporaneous to the assignment in question?   Can a division order alter or amend an agreement or title documents?

Ultra and Questar filed a combined brief, but did not include a statement of the issues. We glean this summary of the issues from headings used within their brief:

I.   The quantum of the overriding royalty interest conveyed by the BLM assignments was indefinite, unclear and not apparent thereby necessitating the introduction of extrinsic evidence.

A.   Nature of ambiguity and lack of clarity.

1.   [Wadi] takes inconsistent positions regarding whether the BLM assignments are silent as to proportionate reduction.

2.   Silence can create ambiguity where the omitted term would naturally be present.

3.   To avoid ambiguity regarding proportionate reduction, the parties must state explicitly the intention to reduce or not to reduce.

4.   The BLM assignments are ambiguous on their face[s].

B.   Admission of extrinsic evidence regarding proportionate reduction is appropriate where the instrument is not clear on its face.

C.   [Wadi] concedes [that] extrinsic evidence is necessary for the trial court to interpret the BLM assignments.

1.   [Wadi's] previous counsel agreed that extrinsic evidence was necessary to interpret the BLM assignments.

2.   [Wadi's] acquisition manager would have inquired further had he seen the BLM assignments.

3.   The testimony of William Schwartz, [Wadi's] expert witness, supported the need for extrinsic evidence to determine the quantum of interest reserved by Hondo.

II.   Prior to this litigation, all attorneys examining title concluded that the BLM assignments were indefinite, unclear and not apparent.

III.   The BLM assignments placed Wadi on inquiry notice with respect to whether proportionate reduction was intended.

IV.   Extrinsic evidence indicates that the overriding royalty interests now owned by [Wadi] were intended to be proportionately reduced.

A.   The 1978 agreement indicates that Hondo and EPNG intended the overriding royalty interest to be proportionately reduced absent specific language to the contrary.

B.   The division orders signed by Hondo reflect an intention to proportionately reduce the reserved overriding royalty interest.

1.   The documents offered by [Wadi] as extrinsic evidence are silent as to proportionate reduction.

2.   The extrinsic evidence offered by [Wadi] is subsequent to the 1978 transaction and therefore entitled to no greater weight than other extrinsic evidence.

3.   The division orders signed by Hondo merely clarify [its] intent regarding proportionate reduction and do not alter or amend any contractual agreement.

C.   EPNG, the other party to the transaction in 1978, agreed that it was the inten-

tion of the parties that Hondo's reserved overriding royalty interest was to be proportionately reduced.

D. [Ultra's and Questar's] title experts opined that proportionate reduction of the reserved Hondo interest was likely intended by the BLM assignments.

V. The decision of this Court in *Amoco Production Company v. EM Nominee Partnership Company* is consistent with the trial court's ruling in this case.

VI. [Wadi's] interest can be no greater than the interest of its predecessors in interest.

## FACTS

[¶ 4] The properties at issue in this case are included in a federal oil and gas unit (the Mesa Unit, formerly known as the Pinedale Unit) located in Sublette County, southwest of Pinedale. Significant new drilling and production commenced in the unit during 1997–98, which is the event that precipitated the controversy at hand, *i.e.,* there was additional revenue to be divided up among the several interest holders. Ultra and Questar are two of the three working interest owners with respect to the leases at issue (the third working interest owner is not a party to this litigation). Questar is the operator of the unit. The six leases at issue have a lengthy title history, but it suffices to note here that, during late 1993 and early 1994, they were acquired by Wadi. Wadi claimed that it acquired a 3.125% overriding royalty interest (ORRI) in those leases, and Ultra and Questar claimed that Wadi only acquired a .625% interest because Wadi's predecessors in interest held only a 20% working interest (therefore, Wadi's interest was 20% of 3.125% = .625%). The six leases at issue are these:

| Lease # | Wadi's claimed ORRI | Conceded ORRI |
|---|---|---|
| WY – 08589 | 3.125% | .625% |
| WY – 08592 | 3.125% | .625% |
| WY – 08593 | 3.125% | .625% |
| WY – 015315 | 3.125% | .625% |
| WY – 015317 | 3.125% | .625% |
| WY – 016167 | 3.125% + 1% | .625% + 1% previously owned |

[¶ 5] On Bureau of Land Management forms designed to accommodate the assignment of such interests, Wadi's predecessors in interest indicated that the overriding royalty or production payments reserved were 3–1/8% of 8/8, as shown above. In another more-or-less contemporaneous document (which is referred to as the "1978 agreement") relating to these same properties, this language was used by Wadi's predecessors in interest:

... and reserving, however, unto Hondo, and El Paso does hereby, as may be necessary assign unto Hondo, an undivided **1/16th of 8/8ths overriding royalty interest** as to the lands and leases shown on exhibit B below the above-described depth limitation, which overriding royalty **shall not be proportionately reduced** if El Paso owns less than the entire leasehold interest; and further reserving unto Hondo all rights and interests of Hondo above said above depth limitation.

El Paso hereby agrees that El Paso shall assume any and all obligations, if any, of Hondo attendant to the interests of Hondo released or assign [*sic*] hereby and further acknowledges that Hondo shall by separate assignments transfer unto El Paso all of the record title of Hondo within the Pinedale Unit as constituted prior to the September 12, 1977 contraction, except those lands and leases shown on Exhibit B, **reserving unto Hondo a 3–1/8% overriding royalty interest** in addition to any existing leasehold burdens.

[¶ 6] There are two items in the above-quoted passage that contribute to the controversy at hand. First, with respect to the 1/16 of 8/8 royalty on exhibit B lands, the document specifically provides that it is not to be proportionately reduced. With respect to the 3–1/8% overriding royalty on other lands, which is the provision that affects the leases at issue herein, the document is silent as to proportionate reduction. Wadi contends that the document is clear that no proportionate reduction was intended with respect to any of the interests included in

that document. On the other hand, Ultra and Questar contend that the document suggests that proportionate reduction was intended because of the silence; however, at a minimum, the silence creates an ambiguity which requires reference to evidence outside the four corners of the principal documents.

[¶ 7] The district court made detailed findings, and we will summarize the pivotal facts it included in those findings. As we embark on this summary, we take note that the record includes more than 1,000 pages of exhibits and more than 600 pages of testimony. It is conceded by all parties that Wadi owned whatever interests were owned by its predecessors in interest and, stated in other terms, there was nothing about the transaction which resulted in Wadi obtaining an interest which was either greater than or lesser than the interest which was created when the leases came into being. The six leases at issue here were purchased by Wadi as part of an agreement, which gave them an interest in some 900 wells and 300 fields. Those properties were divided into two categories, A and B properties. The six leases at issue were in the B category and were transferred without warranty of title, "as is, where is, with all faults and defects." It was contended by Ultra and Questar that Wadi essentially paid nothing for the category B properties and the district court made a finding to that effect. As shall become evident as we proceed through a discussion of the issues, this "fact" (Wadi disputes the validity of the finding) plays no role in our decision, though it is a point that is a part of the "whole story." The district court also found that Wadi did not diligently research exactly what it bought, especially with respect to the properties at issue, but we place this point in that same category as being a part of the "whole story," although it has no direct impact on our ultimate decision. It is clear from the record that had Wadi been more diligent in its search of records it would have found that division orders, as well as other documents, indicated that Wadi's interest in these six leases was very likely subject to proportionate reduction as claimed by Ultra and Questar. That too is part of the "whole story," but we also need not rely on that

circumstance as a part of the basis for our decision.

[¶ 8] The record in this case includes title examinations done by several experienced oil and gas lawyers, all but one of whom indicated that the probable consequence of the original leases and assignments would be that Wadi's interest would be proportionately reduced to .625%. The record also reflects that Wadi's predecessors in interest received all production revenue at the .625% rate.

[¶ 9] The district court determined "that the assignments in which the subject overrides were reserved are ambiguous as to the amount reserved," and ultimately that, based on the extrinsic evidence considered, the ambiguity should be resolved in favor of Ultra and Questar.

## STANDARD OF REVIEW

[¶ 10] The applicable standard of review is well-summarized in a case that is cited by both parties for its substantive holdings, as well as for its articulation of the pertinent standard of review:

A summary judgment is appropriate in litigation when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law. *Ahearn v. Anderson–Bishop Partnership,* 946 P.2d 417, 421 (Wyo.1997); *Woodard v. Cook Ford Sales, Inc.,* 927 P.2d 1168, 1169 (Wyo.1996); *Roemer Oil Co. v. Aztec Gas & Oil Corp.,* 886 P.2d 259, 262 (Wyo.1994); *see also,* W.R.C.P. 56(c). In contract litigation, when the terms of the agreement are unambiguous, the interpretation is a question of law, and a summary judgment is appropriate because there is no genuine issue of material fact. *Examination Management Services, Inc. v. Kirschbaum,* 927 P.2d 686, 689 (Wyo.1996); *Union Pacific Resources Co. v. Texaco, Inc.,* 882 P.2d 212, 218–19 (Wyo.1994). Whether a contract is ambiguous is a question of law for the reviewing court. *Prudential Preferred Properties v. J and J Ventures, Inc.,* 859 P.2d 1267, 1271 (Wyo.1993). We review questions of law *de novo* without affording deference to the decision of the district court. *Hermreck v. United Parcel Service, Inc.,* 938 P.2d 863, 866 (Wyo.1997); *Griess*

v. Office of the Atty. Gen., Div. of Criminal Investigation, 932 P.2d 734, 736 (Wyo. 1997).

According to our established standards for interpretation of contracts, the words used in the contract are afforded the plain meaning that a reasonable person would give to them. *Doctors' Co., v. Insurance Corp. of America*, 864 P.2d 1018, 1023 (Wyo.1993). When the provisions in the contract are clear and unambiguous, the court looks only to the "four corners" of the document in arriving at the intent of the parties. *Union Pacific Resources Co.*, 882 P.2d at 220; *Prudential Preferred Properties*, 859 P.2d at 1271. In the absence of any ambiguity, the contract will be enforced according to its terms because no construction is appropriate. *Sinclair Oil Corp. v. Republic Ins. Co.*, 929 P.2d 535, 539 (Wyo.1996); *Prudential Preferred Properties*, 859 P.2d at 1271.

*Amoco Production Company v. EM Nominee Partnership Company*, 2 P.3d 534, 539–40 (Wyo.2000).

[¶ 11] We add this supplementation of that standard of review:

Our primary focus in construing or interpreting a contract is to determine the parties' intent, and our initial inquiry centers on whether the language of the contract is clear and unambiguous. If the language of the contract is clear and unambiguous, then we secure the parties' intent from the words of the agreement as they are expressed within the four corners of the contract. Common sense and good faith are leading precepts of contract construction, and the interpretation and construction of contracts is a matter of law for the courts. *Reed*, ¶ 10, 18 P.3d 1161. We have also recognized that the language of a contract is to be construed within the context in which it was written, and the court may look to the surrounding circumstances, the subject matter, and the purpose of the contract to ascertain the intent of the parties at the time the agreement was made. *Polo Ranch Company v. City of Cheyenne*, 969 P.2d 132, 136 (Wyo.1998).

*Williams Gas Processing—Wamsutter Company v. Union Pacific Resources Company*, 2001 WY 57, ¶ 12, 25 P.3d 1064, ¶ 12 (Wyo. 2001); *also see Boley v. Greenough*, 2001 WY 47, ¶ 11, 22 P.3d 854, ¶ 11 (Wyo.2001) ("In interpreting unambiguous contracts involving mineral interests, we have consistently looked to surrounding circumstances, facts showing the relations of the parties, the subject matter of the contract, and the apparent purpose of making the contract."); and *Newman v. RAG Wyoming Land Company*, 2002 WY 132, ¶¶ 11–12, 53 P.3d 540, ¶¶ 11–12 (Wyo.2002).

[¶ 12] However, if the meaning of a contract is ambiguous or not apparent, it may be necessary to use evidence in addition to the contract itself in order to determine the intention of the parties. In such instances, interpretation of the contract becomes a mixed question of law and fact. *Wilder v. Cody Country Chamber of Commerce*, 868 P.2d 211, 216 (Wyo.1994); *Alexander v. Phillips Oil Company*, 707 P.2d 1385, 1387 (Wyo. 1985):

If the contract is ambiguous, the intent of the parties may be determined by resort to extrinsic evidence. *Rouse*, 658 P.2d at 78; *Mountain Fuel Supply Co. v. Central Engineering & Equipment Co.*, 611 P.2d 863 (Wyo.1980). An ambiguous contract is one "which is obscure in its meaning because of indefiniteness of expression or because of a double meaning being present." *Farr*, 746 P.2d at 433. See also *Bulis*, 565 P.2d at 490. The existence of ambiguity is a question of law. *Hensley v. Williams*, 726 P.2d 90 (Wyo.1986); *Amoco Production Co.*, 612 P.2d at 465.

*True Oil Company v. Sinclair Oil Corporation*, 771 P.2d 781, 790 (Wyo.1989).

## DISCUSSION

### May Expert Testimony be Used to Render the Assignments Ambiguous?

[¶ 13] In his treatise on oil and gas law, Richard Hemingway includes this discussion which is especially apropos to the issue we must resolve in this case:

#### (A) Definition of Fraction

As in the case of all interests carved out of the lessee's interest, care must be used

in defining the fraction or quantum interest. Pure Oil Co. assigns to A an overriding royalty of 1/16. Consider the following statements of interest:

(a) 1/16 out of the lessee's 7/8 interest;

(b) 1/16 out of 7/8;

(c) 1/16 out of 7/8 working interest;

(d) 1/16 out of 7/8 leasehold.

In each instance the statement of the interest is ambiguous. In all four cases the interest is susceptible of two constructions: (1) that the interest is a full 1/16 interest (or 8/128) and is merely payable out of the lessee's interest; or (2) that the quantum of the interest is of the lessee's interest under the lease, and not of full production, i.e., $1/16 \times 7/8 = 7/128$. In both (c) and (d), an additional interpretation may be made that the interest is equal to $1/16 \times 7/8 \times 7/8 = 49/1008$. This is due to the fact that the terms "working interest" and "leasehold estate" have a common meaning as the right to 7/8 of production. Since the fraction 7/8 and the particular phrase both appear in the clause it might be assumed by some that both be given effect. Therefore, it is necessary that the draftsman define the fraction precisely. If it is the intent that a full 1/16 interest be created the clause should read, "1/16 of 8/8 of production," or "1/16 of gross production." If the lesser interest, the phrase may read, "1/16 of 7/8 of 8/8 of production," or "1/16 of 7/8 of gross production."

An additional problem will occur where the lease from which the non-cost-bearing interest is created does not cover the full interest in the minerals. In the above illustration assume that the lease of Pure Oil Company covers only a one-half interest in the minerals. Two constructional problems occur. The first is whether the proportionate reduction clause in the lease applies to reduce the overriding royalty or production payment in proportion to the interest under lease. However, by the lease terms the proportionate reduction clause applies only to interests created under the lease.

The second problem is just the converse of the first. Where the non-cost-bearing interest is created under the ½ interest lease of Pure above, will it be automatically reduced in amount, due to the drafting of the assignment? It is the normal practice to tie the non-cost-bearing interest to the lease from which it is created. In the above illustration Pure drafts the following clause:

" * * * an overriding royalty of 1/16 of 7/8 of 8/8 of all of the oil, gas and other minerals *produced and saved under and by virtue of said lease.*"

Query: As the lease covers only half of the minerals, does the non-cost-bearing interest refer only to the half mineral interest under the lease? Under some authority it would seem that the answer is yes, and that the overriding royalty interest created is only a 1/32.

To protect against either undesired result a clause should be inserted into the instrument providing that the non-cost-bearing interest will or will not be reduced, regardless of the interest under lease. Also a further provision may be inserted to deal with the effect of failure of title to the lease interest:

"Although it is believed that the net mineral interest in the said lease owned by the Assignor amounts to not less than a 0.875000 working interest, if by reason of failure of title in whole or in part, or for any other reason, the net mineral leasehold interest actually acquired by Assignor in said lease should be less than the interests hereinbefore set forth, then the overriding royalty interest herein assigned to Assignee shall not be reduced in amount as hereinabove set forth."

Where it is desired that the overriding royalty be reduced the phrase may be changed to read, "then the overriding royalty interest herein assigned to Assignee shall bear its proportionate part of such loss and shall be reduced proportionately." Where a partial interest lease is assigned and it is desired that the interest not be reduced due to title loss, recitations in the above clause should be changed appropriately. [Footnote omitted.]

Richard W. Hemingway, *Law of Oil and Gas,* § 9.9(A), at 635–637 (3rd ed.1991); *also*

see 2 Howard R. Williams, Charles J. Meyers, *Oil and Gas Law*, § 411.1(c) and (d), at 308–13 (*see* esp. p. 312, "The assignment instrument may and should expressly provide for or against proportionate reduction.") (2002); 4 Howard R. Williams, Charles J. Meyers, *Oil and Gas Law*, § 686.2, at 432–457 (*see* esp. p. 447, "It would be preferable under such circumstances to treat the instrument as ambiguous and to admit parol evidence to assist the fact finder in resolving this ambiguity [where proportionate reduction clause is lacking].").

██ [¶ 14] Relying on this authority, we hold that the district court correctly concluded that the reservations of the overriding royalty interests were ambiguous due to a lack of clarity and incompleteness of expression. Therefore, we need not directly respond to this argument. Because the assignments did not make that point clear, they were ambiguous and it was necessary for the district court to consider extrinsic evidence, which properly included the opinions of experts in oil and gas law, in order to resolve the ambiguity which arose on the face of the assignments. The ambiguity was not structured by those opinions. They were merely used by the district court in resolving the pre-existing ambiguity. This readily distinguishes this case from *Amoco Production v. EM Nominee Partnership*, 2 P.3d 534, 541 (Wyo.2000) wherein we held:

> Nothing in the language of Article 11 of the Unit Agreement addresses the repayment of leasehold royalties previously paid. Its plain language is concerned only with the potential of retroactive adjustment of royalties for production that had occurred prior to the effective date of the revision of the participating area. Amoco's endeavor to invoke the testimony of experts with respect to industry custom and practice in applying this language inverts our rule with respect to extrinsic evidence. Instead of relying upon the extrinsic evidence to resolve an ambiguity, Amoco seeks to invoke the extrinsic evidence to structure an ambiguity. This would amount to this Court writing a new contract for the parties, and we are foreclosed from that endeavor. *Union Pacific Resources Co.*, 882

P.2d at 220; *Prudential Preferred Properties*, 859 P.2d at 1271.

In the instant case the ambiguity is inherent in the assignments, and the extrinsic evidence is used only to assist the trial court in resolving the ambiguity.

## Did the Executory Contract of Sale Merge into the Filed Transfer Document?

██ [¶ 15] In this argument, Wadi asserts that Ultra and Questar promote a theory that the original assignments "imply" proportionate reduction, and that the silence of the 1978 agreement with respect to proportionate reduction also "implies" that proportionate reduction should apply. Relying in part on our decision in *EM Nominee*, Wadi contends that "silence" does not create ambiguity. Again, *EM Nominee* is distinguishable in this regard. The authorities we have cited and relied upon emphasize that in an instance such as this, silence leaves open the question of proportionate reduction, whereas that line of reasoning was not applicable to the "silence" with which we were concerned in *EM Nominee*. In addition, Wadi recites this passage from *40 North Corporation v. Morrell*, 964 P.2d 423, 426 (Wyo.1998) to advance an argument that the relevant title documents "merged" so as to render them unambiguous:

> 40 North accepted a warranty deed to the property in exchange for a promissory note and mortgage. While the executory contract for sale stated that the resulting mortgage would have a subordination clause, the final agreement did not include such a clause. At the time of delivery and acceptance of the deed, the executory contract for sale merged into the deed, mortgage and promissory note. 40 North can only assert breach of contract against the Morrells based upon the covenants in the deed, mortgage, and promissory note. Since there is no subordination clause in the mortgage, 40 North has no basis for asserting breach of contract.

Comparing the circumstances of the *40 North* case to those of the instant case, we are simply unable to see the applicability of the "merger" theory propounded by Wadi.

## May a Division Order Alter or Amend the Title Documents?

[¶ 16]   Wadi contends that the only documents that may be considered are the assignments themselves and the 1978 agreement. Wadi contends that the district court could not consider a March 15, 1984 Division Order, which indicated that Wadi's predecessors in interest, Hondo, owned a .625% ORRI. Wadi contends that use of a division order in such a fashion is prohibited by Wyo. Stat. Ann. § 30–5–305(a) (LexisNexis 2001):

§ 30–5–305. **Collection; reporting and remittance of royalties.**

(a) Unless otherwise expressly provided for by specific language in an executed written agreement, "royalty", "overriding royalty", "other nonworking interests" and "working interests" shall be interpreted as defined in W.S. 30–5–304. A division order may not alter or amend the terms of an oil or gas lease or other contractual agreement. A division order that alters or amends the terms of an oil and gas lease or other contractual agreement is invalid to the extent of the alteration or amendment and the terms of the oil and gas lease or other contractual agreement shall take precedence.

[¶ 17]   The flaw in this argument is that the division order was not used to "alter or amend" the terms of the assignments but only to assist the trial court in resolving the inherent ambiguity in the assignments.

[¶ 18]   Finally, Wadi maintains that there are many other documents which were created both before and after the creation of the division order that indicate Wadi's ORRI should be 3.125% and, therefore, there is no need to look at the division order. We have carefully reviewed those documents, and we are convinced that they do nothing more than perpetuate the ambiguity, which originated in the disputed assignments.

## CONCLUSION

[¶ 19]   We hold that the district court was correct, as a matter of law, in determining that the disputed assignments were ambiguous. Because the assignments were ambiguous, the district court properly examined extrinsic evidence in order to resolve the ambiguity. We also agree with the district court's evaluation of the evidence that produced the conclusion that Wadi's interest was proportionately reduced to .625%. The order of the district court is affirmed, and the matter is remanded to the district court for further proceedings consistent with this opinion.